[No. 26446-0-I.   Division One.   December 23, 1991.]

THE STATE OF WASHINGTON, *Respondent,* v. GREGORY
SIMON, *Appellant.*

*Theresa B. Doyle* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Michael Shaw, Deputy,* for respondent.

KENNEDY, J. — Appellant Gregory Simon challenges his conviction for promoting prostitution in the first degree. Specifically, appellant contends that (1) the information was constitutionally defective, (2) there was insufficient evidence to support a conviction under one of the charged means of promoting prostitution, (3) the trial court erred in admitting a detective's testimony about the nature of the relationship between a pimp and prostitute, and (4) the trial court erred in admitting testimony regarding postarrest threats made by appellant. We reverse and remand for a new trial.

I

On February 22, 1990, the State filed an information charging appellant Gregory Simon with promoting prostitution in the first degree:

> That the defendant Gregory Mark Simon[] in King County, Washington, during a period intervening between February 15, 1990 to February 18, 1990, did knowingly advance and profit from the prostitution of Bobbie Bart[all], a person who was less than 18 years old;
>     Contrary to RCW 9A.88.070(1)(b), and against the peace and dignity of the state of Washington.

The day before trial, the State amended the information to charge alternative means of committing the crime:

> That the defendant Gregory Mark Simon[] in King County, Washington, during a period intervening between February 15, 1990 to February 18, 1990, did knowingly advance and profit by compelling Bobbie J. Bart[all] by threat and force to engage in prostitution; and did advance and profit from the prostitution of Bobbie Bart[all], a person who was less than 18 years old;
>     Contrary to RCW 9A.88.070(1)(a) and (b), and against the peace and dignity of the state of Washington.

At trial, Simon did not object to the contents of the amended information. Also at trial, both the State and the defense agreed that the State had the burden of proving that Simon knew Bobbie Bartall was under 18.

Bobbie Bartall (Bartall) testified on behalf of the State. Bartall, 17, testified that she began prostituting at the age of 12 in Clackamas, Oregon. In December 1989, Bartall met

appellant Gregory Simon (Simon) and Jimmy Love in Portland, Oregon. Jimmy Love later became Bartall's pimp.

In early February 1990, Simon became Bartall's pimp. Bartall testified that Simon "kind of decided that I would be with him." Bartall testified that Simon informed Jimmy Love that he was taking over as Bartall's pimp.

With money that Bartall earned from prostituting, Simon bought train tickets to Seattle. Before leaving for Seattle, Simon arranged to have false identification made for Bartall because she had several warrants out for her arrest and because she was only 17. Bartall testified that Simon knew that she was 17 because he had seen her birth certificate, her GED, and her Army papers, and also because she had told him that she was 17.

In Seattle, Bartall and Simon moved into the Greenlake Motel. Bartall testified that Simon paid for the room with money that she had given him. Bartall stated that she worked as a prostitute for 4 or 5 days in Seattle and that she turned the money she earned over to Simon.

Bartall testified that at one point when she told Simon she wanted to leave, Simon "[b]asically told me that it wasn't going to be that way." Another time when Bartall told Simon that she was leaving, Bartall testified that Simon "grabbed me at the door and dragged me into the motel room, and we struggled for a moment, and he brought me in." When asked if she felt she could leave Simon, Bartall testified:

A: No.
Q: Why not?
A: Basically because once they see you can get money for them, they are not going to want you to leave. And you can always get money. And after that one incident, when I started to walk out the door, he was just — like he said he knew how to find me if I'd leave.
Q: He would know to find you?
A: Yes.
Q: Did he know where to find you?
A: Yes.
Q: Where would that be?
A: He knew where my house was, where the apartments [were]. He knew basically the spots where I hung out, the

town I was from, you know, stuff like that. He had phone numbers of mine — addresses.

On February 18, 1990, Simon gave Bartall $35 to purchase clothing for use in prostitution. Bartall went to the Bon Marche at Northgate where she was arrested for shoplifting. Bartall told the arresting officer her true name and that she was a prostitute. She also told the officer that Simon was her pimp. Subsequently, Simon was arrested at the Greenlake Motel.

When asked by the prosecutor why she was willing to testify against Simon, Bartall stated:

A: Basically because once the thing — Once they did arrest him, he began to make threats towards me.
MR. KOLKER: Objection, Your Honor.

. . . .

BY MR. CLINE:
Q: Did you directly talk to the defendant?
A: No, I did not.
Q: So what you are talking about was something that was indirect?
A: The sergeant told me.
MR. KOLKER: Objection, Your Honor. The question calls — The statement is hearsay. Again I move that it be stricken.
THE COURT: I'll overrule the objection.

BY MR. CLINE:
Q: And is that — That's why you are willing to testify as a witness in this case?
A: That's not all of it.
Q: What's the rest of it?
A: It's part of it. Basically because I'm tired of pimps being able to just think since they got the title of a pimp, they can go around abusing and using people.

The defense later moved for a mistrial arguing that the threats allegedly made by Simon after his arrest were hearsay and prejudicial. The trial court held that a mistrial was not appropriate because, from the testimony, it was clear that the threats were not directly from Simon; therefore, the jury would not be unduly confused or prejudiced. The court also stated that the testimony was relevant to Bartall's state of mind and her willingness to testify.

The State also called Detective Robert Benson. Detective Benson, a Seattle Police vice detective, took a statement

from Bartall after her arrest for shoplifting. Detective Benson had been involved in investigating street prostitution for over 6 years and had investigated over 400 prostitution related crimes. Detective Benson testified about his contact with prostitutes and about his conversations with prostitutes regarding the pimp/prostitute relationship. Detective Benson stated that he had investigated over 50 promoting prostitution cases. Detective Benson also testified that he had taken no course work in this area and that there are no courses for police officers that cover arresting prostitutes or investigating promotion of prostitution. The court qualified Detective Benson as an expert, over defense objections of lack of foundation.

Detective Benson then testified, based on his experience, about the relationship between a pimp and a prostitute:

A: I would have to say that my experience indicates that there are in fact two separate and distinct relationships based essentially on the same premises. And that is the pimp's psychological manipulation of the prostitute. And, in fact, there are what are referred to as a "Hard Mack" and a "Soft Mack."

Q: What does the term "Mack" mean?

A: "Mack" is a street word that [is] used to refer to a pimp. And it comes from the French word for pimp.

Q: Okay.

A: A "Soft Mack" typically will be — Most prostitutes will encounter a "Soft Mack" before a "Hard Mack." The "Soft Mack" will be what's referred to as a boyfriend pimp. It will be somebody who butters her and tells her that she's real good looking, and we can have our way with the world, babe. Just go out and get us some money. He's the pimp that will convince her that he is in love with her, and this is their avenue to progress in the world. And then there's the "Hard Mack." And generally, when a gal encounters a "Hard Mack," some[one] who is very forceful and psychologically dominating, they are already in the state of mind where they are amenable to that person's suggestions or threats, even if the threats aren't overt; they are in a frame of mind where they are amenable.

. . . .

Q: What sort of personalities do most of the prostitutes have that you have come in contact with?

A: Most of the prostitutes that I have come in contact with have had very little or no self-esteem. They think very

poorly of themselves. They are essentially, in their own minds, they are worthless.

. . . .

Q: Do most of the prostitutes that you had contact with enjoy being prostitutes?

A: No, they don't.

Q: Why do they continue doing it?

A: They have no option.

Q: In their mind they have no option?

A: Correct.

Q: In terms of the financial relationship between a pimp and a prostitute, what would be a typical financial relationship?

A: The financial — The standard financial relationship is that the prostitute gives the pimp every penny that she earns. And say, for example, if she smokes cigarettes she'd have to come to him to get money back to go buy cigarettes. If a pimp finds a prostitute holding out any of her profits, in some cases, well, that's grounds for punishment, whatever his punishment might be.

Q: How do pimps regulate maintaining their stock of prostitutes? Is that question clear?

MR. KOLKER: Objection, Your Honor. I'm going to object to this whole line of questioning on the grounds of relevance.

THE COURT: I'll permit an answer.

BY MR. CLINE:

Q: Maybe I can rephrase it.

A: Yes.

Q: How is it that a pimp manages to keep control of or have access to prostitutes?

MR. KOLKER: Same objection.

THE COURT: I'll overrule the objection.

A: Okay. The prostitutes come from the ranks of the runaways. Essentially, by keeping in contact with the people that are on the street looking for something, looking for shelter, looking for something to eat, they will continually be in contact with new faces.

BY MR. CLINE:

Q: Well, if a prostitute wants to switch and work for somebody else, are they typically deemed to be free agents, and they can move around at will?

A: No, they are not.

Q: What impediments are there to doing that?

A: Well, a pimp doesn't want to give up a girl. I mean, for obvious reasons, he gets an income from the girl, and the girl has value to him in that she is a steady source of income. And if she decides that she wants to be with a different pimp, it is the burden of that pimp to go to her

former pimp and notify him that she won't be bringing you money anymore, she's now bringing her money to me.

The defense called Carl R. Garrison, a builder and fruit and vegetable seller. Garrison testified that Simon had worked for him periodically since 1977. On February 16, 1990, Garrison met with Simon. Garrison testified that at this meeting, he offered Simon a job. Garrison also testified that he gave Simon a $200 advance. The purpose of this testimony was to show that Simon had means of supporting himself other than promoting prostitution.

On May 9, 1990, the jury found Simon guilty of promoting prostitution in the first degree. On July 2, 1990, he was sentenced to 38 months. Simon appeals the judgment and sentence.

## II

## A

### Constitutionality of the Information

Simon first contends that the amended information was constitutionally defective because it failed to allege an essential element of one of the charged means of committing the crime of promoting prostitution, specifically, knowledge that Bartall was under the age of 18. Simon asserts that the amended information violated his right to due process because it failed to notify him of the nature of the accusation against him.[1]

---

[1]Simon also argues that this omission deprived the trial court of subject matter jurisdiction because, without charging that Simon knew Bartall was under 18, the information failed to charge a crime. In *State v. Kjorsvik*, 117 Wn.2d 93, 812 P.2d 86 (1991), the Supreme Court held that a constitutional challenge to a charging document does not impact the jurisdiction of a trial court. The court stated at pages 107-08:

Our Court of Appeals recently observed that although some courts have referred to the essential elements rule as "quasi-jurisdictional", it is questionable whether the essential elements rule contains any jurisdictional questions which would result in the harsh consequence of automatic dismissal. We agree. Recent case law from this court has not viewed charging document challenges as involving subject matter jurisdictional issues, and we decline to adopt such a view.

(Footnotes omitted.)

We therefore need not address Simon's challenge to the subject matter jurisdiction of the trial court.

■ In *State v. Kjorsvik*, 117 Wn.2d 93, 812 P.2d 86 (1991), the Supreme Court adopted the federal standard of liberally construing charging documents when they are challenged after the verdict or for the first time on appeal. The court included in this standard a 2-prong test: (1) an inquiry into whether the charging document contains the crime's essential elements and, if so, (2) an inquiry into whether there was nevertheless actual prejudice caused by the lack of notice. The essential elements prong involves an inquiry as to whether "the necessary facts appear in any form, or by fair construction can they be found, in the charging document". *Kjorsvik*, 117 Wn.2d at 105-06.[2] Only if a reviewing court determines that the information by fair construction contains the essential elements of the crime charged may the court reach the second prong of the *Kjorsvik* test — actual prejudice. The actual prejudice prong involves an inquiry as to whether the defendant can "show that he or she was nonetheless actually prejudiced by the inartful language which caused a lack of notice". *Kjorsvik*, 117 Wn.2d at 106.

Applying this 2-prong standard of review to the instant case, we must first inquire whether the missing element of knowledge that Bartall was under 18 "appears in any form, or by fair construction can be found in this information." *Kjorsvik*, 117 Wn.2d at 108. When an information omits a statutory element of the charged crime, the information is constitutionally insufficient because it fails to state an offense. *State v. Holt*, 104 Wn.2d 315, 320-21, 704 P.2d 1189 (1985). Although a reviewing court has considerable leeway to construe the necessary allegations, the question this court must address is whether "considerable leeway" means that we can ignore the rules of sentence structure and punc-

---

[2]An inadequate information violates the constitutional right of an accused to be informed of the nature and cause of the accusation against him. U.S. Const. amend. 6; Const. art. 1, § 22 (amend. 10).

tuation that assist in determining the meaning of written words.

■ The information charged Simon with violation of RCW 9A.88.070(1)(a) and (b). RCW 9A.88.070 provides:

**9A.88.070 Promoting prostitution in the first degree.**
(1) A person is guilty of promoting prostitution in the first degree if he knowingly:
(a) Advances prostitution by compelling a person by threat or force to engage in prostitution or profits from prostitution which results from such threat or force; or
(b) Advances or profits from prostitution of a person less than eighteen years old.

Because a colon follows "knowingly", the statute requires knowledge as to both means of promoting prostitution. *State v. Shipp*, 93 Wn.2d 510, 519, 610 P.2d 1322 (1980).

The amended information contains a semicolon after the first alternative means; the information charged that Simon:

did *knowingly* advance and profit by compelling Bobbie J. Bart[all] by threat and force to engage in prostitution; and did advance and profit from the prostitution of Bobbie Bart[all], a person who was less than 18 years old;

(Italics ours.)

The certificate for determination of probable cause which accompanied the first information did not mention Bartall's age, but rather it focused upon the "threat and force" means which was added by the amended information.

■ Applying *Kjorsvik* to the instant case, we are unable to conclude that the statutory requirement of knowledge that Bartall was under 18 can be fairly implied from any other language in this charging document. As drafted, the information alleges only that Simon advanced and profited from the prostitution of Bartall, who is under 18. Because the semicolon separates the first alternative means from the second, "knowingly" modifies only the first alternative means. RCW 10.37.050 provides in relevant part:

The . . . information is sufficient if it can be understood therefrom —
. . . .

> (6) That the act or omission charged as the crime is clearly and distinctly set forth in ordinary and concise language, without repetition, and in such a manner as *to enable a person of common understanding to know what is intended*;

(Italics ours.) *See Kjorsvik*, 117 Wn.2d at 110. The rules of sentence structure and punctuation are the very means by which persons of common understanding are able to ascertain the meaning of written words. Thus, we must hold that the portion of the information charging that Simon advanced and profited from the prostitution of Bartall, who was under 18, is constitutionally insufficient to provide notice that Simon was charged with "knowingly" promoting the prostitution of a minor.

We therefore are unable to reach the second prong of the *Kjorsvik* test — actual prejudice. Were we able to reach the actual prejudice prong, we would ask whether Simon was actually prejudiced by the vague or inartful language which caused a lack of notice. *Kjorsvik*, 117 Wn.2d at 106. If no prejudice is found, no error has occurred. *Kjorsvik*, 117 Wn.2d at 111.

Here, the *original* information charged that Simon "did *knowingly* advance and profit from the prostitution of Bobbie Bart[all], a person who was less than 18 years old." (Italics ours.) That information was amended the day before trial and is of no further force and effect. *See In re Behrens*, 24 Wn.2d 125, 133, 163 P.2d 587 (1945), *cert. denied*, 327 U.S. 795 (1946). Notwithstanding the amendment, however, at trial, both the State and defense agreed that the State had the burden of proving that Simon knew Bartall was under 18. The jury instructions correctly instructed the jury that the State had the burden of proving that Simon knew Bartall was under 18. Moreover, Bartall testified that Simon knew her age, that he saw her birth certificate, and that he helped her obtain false documents showing her to be past the age of majority. Finally, Simon's defense at trial was that Bartall was not telling the truth and that he did not need money from her; his defense was not that he did not know that she was under 18. Thus, Simon clearly

suffered no prejudice by the amendment of the information the day before trial.

Nonetheless, under *Kjorsvik*, we are compelled to dismiss the portion of the information charging that Simon advanced and profited from prostitution by Bartall, who was under 18, because we cannot reach the second prong of the inquiry.[3]

---

[3]We point out that the *Kjorsvik* test is different from the "constitutional harmless error" analysis advanced by the State for this appeal. In its brief, which was written before *Kjorsvik* was handed down, the State urged this court to apply a constitutional harmless error analysis to an information found to be constitutionally inadequate. The State argued that even if the amended information was constitutionally inadequate for failing to include an essential element of the charged crime, in the context of this case, there was no prejudice and therefore the error was harmless beyond a reasonable doubt.

"It is well established that constitutional errors, including violations of a defendant's rights under the confrontation clause, may be so insignificant as to be harmless." *State v. Guloy*, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985), *cert. denied*, 475 U.S. 1020 (1986). In *Guloy*, the Washington Supreme Court adopted the "overwhelming untainted evidence" standard to determine whether a constitutional error was harmless. Under this test, "the appellate court looks only at the untainted evidence to determine if the untainted evidence is so overwhelming that it necessarily leads to a finding of guilt." *Guloy*, 104 Wn.2d at 426. The court reasoned that:

[t]he "overwhelming untainted evidence" test allows the appellate court to avoid reversal on merely technical or academic grounds while insuring that a conviction will be reversed where there is any reasonable possibility that the use of inadmissible evidence was necessary to reach a guilty verdict.

(Italics ours.) *Guloy*, 104 Wn.2d at 426.

Recently, the United States Supreme Court held that admission of an involuntary confession is subject to a constitutional harmless error analysis. *Arizona v. Fulminante*, 499 U.S. ___, 113 L. Ed. 2d 302, 332, 111 S. Ct. 1246, *reh'g denied*, ___ U.S. ___, 114 L. Ed. 2d 472, 111 S. Ct. 2067 (1991). The court reasoned that the admission of an involuntary confession does not fall within the category of constitutional errors which are not subject to a constitutional harmless error analysis. Such errors are: the total deprivation of the right to counsel at trial; lack of an impartial judge; the unlawful exclusion of members of the defendant's race from a grand jury; the right to self-representation at trial; and the right to a public trial. *Fulminante*, 113 L. Ed. 2d at 331. To find a constitutional error harmless, an appellate court reviews the remainder of the evidence against the defendant to determine whether the admission of the erroneous evidence was harmless beyond a reasonable doubt. *Fulminante*, 113 L. Ed. 2d at 332.

Thus, to find a constitutional error harmless on review, an appellate court must be convinced beyond a reasonable doubt that a jury would have reached the same result had the error not occurred. *Fulminante*, 113 L. Ed. 2d at 332; *Guloy*, 104 Wn.2d at 425. Constitutional error is presumed prejudicial and the State

## B
## Alternative Means

■ Simon next asserts that there was insufficient evidence to support the properly charged alternative means of knowingly promoting prostitution by use of threat or force. Because we have dismissed one of the alternative means of committing the crime of promoting prostitution, profiting from the prostitution of a minor, the proper inquiry on review is, after viewing the evidence as to the remaining means in the light most favorable to the State, "whether there was sufficient evidence to justify a rational trier of fact to find guilt beyond a *reasonable doubt*." (Footnote omitted.) *State v. Green*, 94 Wn.2d 216, 220-21, 616 P.2d 628 (1980) (citing *Jackson v. Virginia*, 443 U.S. 307, 61 L. Ed. 2d 560, 99 S. Ct. 2781 (1979)).

Here, Bartall testified that when she suggested leaving, some degree of physical force was applied by Simon. From that testimony, as well as the testimony of both Bartall and Officer Benson as to the "unwritten rules" that govern the relationship between pimps and prostitutes, a rational trier of fact could find that Simon promoted prostitution by use of threats or force.

■ However, because we have dismissed the alternative means of promoting the prostitution of a minor, to uphold

bears the burden of proving that the error was harmless. *Guloy*, 104 Wn.2d at 425.

The State clearly could meet that burden in the instant case, because up to the day before trial, Simon knew he was being charged with "knowingly" advancing and profiting from the prostitution of Bartall who was under 18. The error in the amended information was inadvertent and apparently went unnoticed by all concerned. The case was tried on the assumption that the State had to prove knowledge of Bartall's minority and the jury was so properly instructed. Moreover, the nature of Simon's defense was not that he did not know Bartall's age. Nor does Simon even bother to claim that he was prejudiced by the defect in the amended information.

Under the circumstances of this case, a reversal under *Kjorsvik* because we cannot reach the actual prejudice prong is exactly the kind of "reversal on a technicality" that confuses and offends so many of our citizens who are not conversant with the intricacies of our criminal processes. Our reversal does not promote judicial economy. The State's constitutional harmless error analysis has considerable merit. Nevertheless, we are bound by *Kjorsvik*.

Simon's conviction, we must also determine whether the jury was unanimous that the State proved the properly charged means of promoting prostitution beyond a reasonable doubt. *Green*, 94 Wn.2d at 230-35.

At trial, the jury was instructed it could find Simon guilty of promoting prostitution in the first degree if convinced beyond a reasonable doubt that Simon:

a) By compelling Bobbie J. Bart[all] by threat or force to engage in prostitution or profited from prostitution resulting from such threats or force; *or*

b) Bobbie J. Bart[all] was less than eighteen years old and the defendant knowingly advanced or profited from the prostitution of Bobbie J. Bart[all] knowing that she was less than eighteen years old.

(Italics ours.) Instruction 7.

The jury rendered a single verdict of guilty of promoting prostitution in the first degree. The verdict form did not provide for a separate jury determination of whether Simon promoted prostitution by use of threat or force or whether Simon promoted prostitution by advancing and profiting from the prostitution of Bartall, knowing she was under 18. Where a single offense may be committed in more than one way, *i.e.*, in an alternative means case, the jury must be unanimous as to the guilt for the single crime charged. *State v. Kitchen*, 110 Wn.2d 403, 410, 756 P.2d 105 (1988). The jury need not be unanimous, however, as to the means by which the crime was committed if substantial evidence supports each alternative means. *Kitchen*, 110 Wn.2d at 410; *see also Green*, 94 Wn.2d at 232-33.[4]

---

[4]Compare an alternative means case with a multiple acts case. In a multiple acts case, the State alleges several acts, any one of which could constitute the crime charged. In such a case:

the jury must be unanimous as to which act or incident constitutes the crime. To ensure jury unanimity in multiple acts cases, we require that either the State elect the particular criminal act upon which it will rely for conviction, or that the trial court instruct the jury that all of them must agree that the same underlying criminal act has been proved beyond a reasonable doubt.

*Kitchen*, 110 Wn.2d at 411.

In *Green,* the defendant was charged with aggravated first degree murder in the course of first degree rape *or* first degree kidnapping. On appeal, the court held that the State failed to establish the elements of kidnapping beyond a reasonable doubt. *Green,* 94 Wn.2d at 230. Because the court held that there was insufficient evidence in support of the aggravating factor of kidnapping, rape was left as the surviving aggravating factor. The jury, however, rendered a single verdict of guilt of aggravated first degree murder. The court stated that it was impossible to tell from the verdict of guilt that the jury had in fact been unanimous as to the rape means. The court thus remanded the case for a new trial. *Green,* 94 Wn.2d at 235.

Similarly to *Green,* here, because it is impossible to determine from the single verdict of guilt whether the jury was unanimous that Simon promoted prostitution by use of threat or force beyond a reasonable doubt, we must remand for a new trial. *See Green,* 94 Wn.2d at 235.

## C
### Detective Benson's Testimony

Because we are remanding for a new trial as to the "force and threats" means by which Simon was charged, we will discuss his remaining contentions in this appeal. Simon next contends that the trial court erred in admitting the opinion testimony of Detective Benson. Simon asserts that Detective Benson's testimony failed to meet the requirements for admitting expert testimony, that it was an improper opinion as to Simon's guilt, and that the admission of this testimony was prejudicial.

■ ER 702 governs the admissibility of expert testimony:

> If scientific, technical, *or other specialized knowledge* will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by *knowledge,* skill, *experience,* training, or education, may testify thereto in the form of an opinion or otherwise.

(Italics ours.) Expert testimony is admissible under ER 702 if the witness qualified as an expert and if the expert tes-

timony "will assist the trier of fact to understand the evidence or to determine a fact in issue . . .." ER 702. The decision to admit expert testimony will be reversed only for an abuse of discretion. *State v. Mak*, 105 Wn.2d 692, 718 P.2d 407, *cert. denied*, 497 U.S. 995 (1986), *sentence vacated on writ of habeas corpus sub nom. Mak v. Blodgett*, 754 F. Supp. 1490 (W.D. Wash.), *appeal docketed*, Nos. 91-35615, 91-35256 (9th Cir. July 9, 1991); *State v. Tatum*, 58 Wn.2d 73, 76, 360 P.2d 754 (1961). "If the reasons for admitting or excluding the opinion evidence are 'fairly debatable', the trial court's exercise of discretion will not be reversed on appeal." *Walker v. Bangs*, 92 Wn.2d 854, 858, 601 P.2d 1279 (1979).

In *State v. Strandy*, 49 Wn. App. 537, 745 P.2d 43 (1987), *review denied*, 109 Wn.2d 1027 (1988), the State offered expert testimony of a police officer who testified that numbers found on a piece of paper in the defendant's wallet were consistent with numbers used in narcotics transactions. The court held that the trial court did not abuse its discretion in qualifying the officer as an expert on the basis that he had been an officer for 6 years, had participated in 30 or more drug transactions, and had found similar writings and numbers in other drug transactions. 49 Wn. App. at 544.

In the instant case, Detective Benson testified that he had been involved in investigating street prostitution for over 6 years, that he had investigated over 400 prostitution related crimes, and that he had investigated over 50 promoting prostitution cases. Detective Benson also testified about his contact and conversations with prostitutes regarding the pimp/prostitute relationship. Although Detective Benson had no formal course work in this area, a witness need not possess the academic credentials of an expert; "[p]ractical experience in a given area can qualify a witness as an expert." *State v. Smith*, 88 Wn.2d 639, 647, 564 P.2d 1154 (1977), *overruled on other grounds in State v. Jones*, 99 Wn.2d 735, 664 P.2d 1216 (1983); *see also* 5A K. Tegland,

Wash. Prac., *Evidence* § 289 (3d ed. 1989). We hold that the trial court did not abuse its discretion in qualifying Detective Benson as an expert and in allowing his testimony.

Expert testimony is inadmissible unless it is helpful to the trier of fact. *State v. Black*, 109 Wn.2d 336, 348, 745 P.2d 12 (1987). "Included in this equation is the question of whether the prejudicial nature of the testimony is so great as to render such testimony inadmissible." *Black*, 109 Wn.2d at 348 (holding expert opinion that rape victim suffered from rape trauma syndrome an improper opinion as to defendant's guilt). Simon asserts that Detective Benson's testimony regarding the pimp/prostitute relationship was unfairly prejudicial because it constituted an opinion as to Simon's guilt, namely, that Simon did not have to threaten Bartall to force her to remain with him.

Detective Benson's testimony regarding the pimp/prostitute relationship was helpful to the jury because the average juror would not likely know of the mores of the pimp/prostitute world. *State v. Ciskie*, 110 Wn.2d 263, 273-74, 751 P.2d 1165 (1988). In addition, unlike *Black*, the testimony did not constitute an opinion as to Simon's guilt. Detective Benson did not testify that Simon did or did not threaten Bartall; rather, Detective Benson testified in general terms about the nature of the pimp/prostitute relationship. Bartall gave similar testimony and she also testified that some degree of physical force was in fact applied when she tried to leave and that an implied threat was made when she suggested leaving. Although the trial court's reasons for admitting the expert testimony are "fairly debatable", we hold that the probative value of Detective Benson's testimony outweighs the possible prejudice. Accordingly, we decline to reverse the trial court's exercise of discretion in admitting the testimony. *Walker v. Bangs*, 92 Wn.2d at 858.

D

Evidence of Postarrest Threats

Last, Simon asserts that the trial court erred in admitting Bartall's testimony that Simon threatened her after he

was arrested. Simon contends that admission of this testimony violated ER 404(b).

ER 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Before admitting evidence of other bad acts, a trial court must determine the purpose and the relevancy of the evidence. *State v. Smith*, 106 Wn.2d 772, 776, 725 P.2d 951 (1986). In determining relevancy, "(1) the purpose for which the evidence is offered 'must be of consequence to the outcome of the action', *and* (2) 'the evidence must tend to make the existence of the identified fact more . . . probable.' " *Smith*, 106 Wn.2d at 776 (quoting *State v. Saltarelli*, 98 Wn.2d 358, 362-63, 655 P.2d 697 (1982)). If a trial court determines that the evidence is relevant, the court must " 'balance the probative value against the *prejudicial effect* . . .' ". *Smith*, 106 Wn.2d at 776 (quoting *Saltarelli*, 98 Wn.2d at 363).

Relevant evidence is evidence that tends to make any fact of consequence more or less probable. ER 401. Here, the alleged threat occurred *after* the charging period. Accordingly, the alleged threat has no relevance to whether Bartall felt threatened during the charging period. Even if Bartall's testimony were relevant, however, the prejudicial effect of her testimony about the threat outweighs any probative value. Based on this testimony, the jury could have improperly concluded that, because Simon threatened Bartall after his arrest, Simon must have threatened and forced Bartall to stay with him during the charging period. Thus, the trial court erred in admitting this testimony under ER 404(b). Because we are remanding for a new trial, we need not address the State's contention that the error was harmless in the context of the first trial.

### CONCLUSION

We dismiss the portion of the information charging that Simon advanced and profited from prostitution by Bartall, who was under 18, as it is constitutionally insufficient under the test enunciated in *Kjorsvik*. We remand for a new trial on the charge of promoting prostitution in the first degree by use of threats or force, as it is impossible to be assured of jury unanimity. We hold that the trial court did not err in admitting Detective Benson's testimony about the nature of the relationship between a pimp and a prostitute. Finally, we hold that the trial court erred in admitting Bartall's testimony regarding postarrest threats made by Simon.

BAKER and AGID, JJ., concur.

Reconsideration denied March 17, 1992.

Review granted and affirmed in part and reversed in part at 120 Wn.2d 196 (1992).