

2016 APR 25 AM 10: 5

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 72799-1-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| YUSSUF HUSSEIN ABDULLE, | ) | UNPUBLISHED OPINION |
| Appellant. | ) | FILED: April 25, 2016 |

BECKER, J. — Yussuf Abdulle appeals his conviction on two counts of promoting commercial sex abuse of a minor. He argues the trial court erred when it admitted irrelevant expert testimony regarding the prostitution business and when it admitted cell phone data obtained using a universal forensic examination device the State failed to authenticate under ER 901(a). Because the expert testimony was relevant and the State presented a prima facie case demonstrating the accuracy of the forensic device, the trial court did not abuse its discretion when it admitted this evidence.

FACTS

Background

BI was born in July 1996. She began prostituting when she was 15 years old. Soon after, she left her family and began living with friends. In February 2013, BI moved in with Yussuf Abdulle, who went by the name "Derrick." BI asked Abdulle if her acquaintance, AP, could also stay with them because she had nowhere else to live. Like BI, AP was born in July 1996 and had left her family as a teenager. She began prostituting in 2013. Abdulle agreed to allow AP to stay with him and BI. He drove to a mutual friend's house to pick up AP and BI the next day.

Abdulle introduced himself to AP as "Derrick." Abdulle told AP he would get her dates—or "jugs"—in exchange for a percentage of what she earned prostituting:

> [Abdulle asked] if I [AP] know what I'm doing, like going out here
> and making these jugs and if I'm really going to give him the cut,
> and I'm not going to—and I'm not going to—he's not going to put
> me on with a jug and then I run off, stuff like that.

AP testified that she was "fine" with the arrangement because Abdulle was giving her a place to stay and "he wouldn't even really ask for a lot" of what she earned. She said that if she earned $100 dollars from prostituting, Abdulle would usually get $40.

When AP first moved in, Abdulle wanted BI to take some pictures of her and then he told AP "he was going to call some of the jugs [and] get things going from there." Abdulle set up six dates for AP. Abdulle arranged the dates, set the

price, and typically drove AP to and from the dates. AP received $120-$130 for each date and would split the money with Abdulle afterward. BI claimed she worked independently, arranged her own dates, kept her earnings, and never paid rent to Abdulle. Abdulle did provide BI with transportation to and from dates "one or two times." AP testified that BI and Abdulle argued about money. She said that BI "didn't really want to give him enough money to stay" in the apartment. BI eventually left the apartment due to her financial disputes with Abdulle. Before she left the apartment, BI gave Abdulle a cell phone and about $100 dollars in cash she had earned prostituting.

On or about March 14, 2013, AP became severely ill due to a pill Abdulle gave her. She called 911 at a nearby 7-11 and was transported to Swedish Hospital. While there, AP met with Sheronda Duncan, an advocate for Real Escape from the Sex Trade. AP disclosed to Duncan that she had been prostituting. Duncan helped AP retrieve her clothing and belongings from Abdulle's apartment and enrolled her in a transitional housing program.

AP's mother contacted the police after learning the details of AP's experience and finding a message on her phone from "Derrick" asking AP to call him back. On April 11, 2013, AP met with Detective Maurice Washington. AP disclosed to Det. Washington that she and BI had been prostituted by Abdulle. AP went with Det. Washington to identify the apartment she had lived in with Abdulle. She also identified two vehicles parked outside the apartment she believed belonged to Abdulle. Det. Washington took AP's cell phone for forensic

examination. He later used a universal forensic examination device to extract data from AP's cell phone.

Det. Washington then located photos of BI through social media and contacted her. BI agreed to cooperate with Det. Washington's investigation. She corroborated many of the details AP had provided to Det. Washington. BI knew the address of the apartment she had lived in with AP and Abdulle. BI went to the location with Det. Washington, where she pointed out the building and the specific unit of Abdulle's apartment. She also identified the same two vehicles that AP had identified as belonging to Abdulle. BI provided her cell phone to Det. Washington who examined it using the forensic device. Later in the investigation, BI identified Abdulle as "Derrick" in a photo montage.

Det. Washington reviewed the results of the reports from the forensic device on both AP's and BI's phones. He discovered a number in both phones that he suspected belonged to Abdulle. AP confirmed this number belonged to "Derrick," and BI had the same number stored in her phone. AP's phone received a text message from this number requesting to meet.

On May 6, 2013, Det. Washington, using AP's phone, posed as AP and arranged a meeting with "Derrick" via text message. Det. Washington brought AP to the meeting location. AP positively identified "Derrick" driving a white Toyota. Officers approached the car, ordered "Derrick" out, and arrested him. After arresting "Derrick," officers discovered a cell phone he had dropped on the ground.

Det. Washington requested and obtained search warrants for Abdulle's apartment and vehicles. A search of one of the vehicles yielded an auto insurance policy for "Yussuf Abdulle" and a yellow receipt with the name "Derrick." Det. Washington took photos of "Derrick" following his arrest, and BI immediately identified him from those photographs.

Det. Washington then attempted to recover cell phone data from the phone obtained during Abdulle's arrest. The universal forensic examination device was unable to connect to the phone, so Det. Washington manually retrieved cell phone information by systematically photographing the cell phone's entire phone call history, text message history, and contact list. He also called the number for "Derrick" he received from AP's phone, and the cell phone recovered from Abdulle began ringing. While searching Abdulle's phone, he discovered AP's number stored in the contact list under the name "Emily." Det. Washington noted several calls and text messages to and from AP's number on Abdulle's phone, some occurring on the day of his arrest. Det. Washington recognized some of the messages on Abdulle's phone as those AP had received prior to the arrest.

Det. Washington also used a universal forensic examination device to analyze a second cell phone recovered from Abdulle's white Toyota. On the second cell phone, Det. Washington discovered 10 to 12 text messages exchanged with AP's phone and 6 to 8 messages exchanged with BI's phone. He found one text exchange from February 19, 2013, where Abdulle told a potential client that he had a "girl" who looked young and would be turning 18 in

July. This corroborated BI's testimony that she told Abdulle she would turn 18 in July that year.

On May 9, 2013, the State charged Abdulle by amended information with two counts of promoting commercial sex abuse of a minor, unlawful imprisonment, and second degree assault.

Expert Testimony

Before trial, the State sought to introduce expert testimony from Det. Joel Banks regarding the prostitution business including the terminology, the relationship between pimp and prostitute, and the culture of the business. Det. Banks worked as a police officer for 19 years, including 13 years as a detective for the Street Crimes/VICE unit for the Sea-Tac Police Department. The State argued Det. Banks's testimony would be helpful as context and background.

Abdulle argued to exclude the testimony because the prostitution business was within the common knowledge of jurors, and the testimony would improperly permit jurors to conclude Abdulle was engaged in the prostitution business. He further argued that the victims' testimony about their experience as prostitutes would likely be sufficient to inform the jury of prostitution practices.

The court ruled that Det. Banks was an expert based on his extensive experience and found his testimony relevant because the topic would be outside the common knowledge of jurors. The court also determined that the expert testimony would be helpful to the trier of fact:

> Then my next question would be whether this information
> would be helpful to the trier of fact. And I do appreciate the
> Defense position with respect to relevance. However, an expert

needn't be strictly necessary for a party's case. The question is whether that evidence would be helpful to the trier of fact. And this is clearly an area where I think most jurors have very limited, if no information or experience. And so for those reasons, I think, it would be helpful for them to hear about, for example, recruiting, typical living arrangements, the business arrangements between the sex worker and the pimp. How that's determined, how the dates are set up, all of that, I think, would be helpful to the trier of fact in addition, to, of course, the particular terms used that may be unfamiliar to jurors.

I won't allow anything that gets close to testimony that this Defendant must have been a pimp that, that he falls within the profile. That won't be allowed.

At trial, Det. Banks defined many terms regularly used by prostitutes, including "game," "blade," "circuit," "jug," "juke," "trick," and "bottom bitch." He explained that pimps sometimes recruit underage girls to work for them, that pimps usually impose a series of rules, and that if a prostitute breaks those rules, she could be punished. Some of the rules included the pimp setting up dates, screening potential dates via text message, and collecting all of the earned money. Det. Banks also testified to the importance of cell phones. He explained that pimps and prostitutes are "constantly texting." Typically, an investigation of a prostitute's phone would reveal "how they're treated by their pimp, the way he speaks to them, the orders he gives, where to meet, how much money was your last jug, that kind of stuff."

After Det. Banks was excused, Abdulle renewed his earlier objection and asked the court to strike the expert testimony. He argued Det. Banks's testimony was not specialized, not relevant to the anticipated testimony, and not outside the common knowledge of the jury. The court denied Abdulle's motion to strike, stating that Det. Banks's expertise was beyond the knowledge of the average

person and that his testimony was relevant to the case because he discussed how pimps set up dates, use text messaging, and divide money.

Cell Phone Testimony

Det. Washington used a universal forensic examination device to investigate the cell phones he recovered from AP, BI, and Abdulle. The device, when turned on, indicates whether it is properly functioning and calibrated. The device then displays a step by step process guiding the user to connect a cell phone and prepare it for examination. Det. Washington explained how the extraction process works:

> Okay. So, the interaction between the device and the phone is, the device is set up to do two types of reads or analysis of the phone. It can do a physical extraction of information from the phone and it can do a logical extraction. The difference, physical extraction is a bit by bit copy of the flash memory of the phone. So you're getting all the live data, phone calls that were made in and out, text messages, instant message, emails, applications that are used, Facebook, Twitter, any of those types of things. You're getting that from a physical extraction. You're also getting from a physical extraction any hidden information that's on the phone, i.e. pass words, secret vaults that are put on the phone, you're getting that, and you're also getting deleted data, anything that the person has recently tried to delete off the phone, that information is captured with a physical extraction.
> . . . .
> Okay? And then the other type of extraction it does is the logical extraction. And the logical extraction does a live or extracts live data from the phone, what has just occurred on the phone and can be absorbed or kept in its memory. That does not include hidden data, and that doesn't include deleted data.

The device will determine which type of extraction it can perform on the phone. The device will notify the user that the extraction is complete.

Det. Washington testified that he had received "several weeks, several months" of training on how to operate the device. He had been trained by fellow detectives and FBI agents. He also testified that he uses the device "two to three times a week" and had done so on "hundreds" of previous occasions. The devices are kept in a forensic office and a FBI office with specially trained personnel who maintain the machines and update their software.

Det. Washington performed a full extraction from AP's phone but only a partial extraction of BI's phone. A portion of the report from AP's phone containing text messages from the number associated with Abdulle was admitted. Only a portion of BI's "contacts" list containing the same number identified as "answer don't" was admitted. The report of Abdulle's phone containing messages exchanged with AP and BI was admitted.

At the conclusion of trial, the jury convicted Abdulle on two counts of promoting commercial sex abuse of a minor. The jury acquitted him of the unlawful imprisonment and assault counts. The court imposed a sentence of 189 months in prison followed by 36 months of community custody. Abdulle appeals.

ANALYSIS

Expert Testimony

Abdulle contends the trial court abused its discretion when it admitted Det. Banks's expert testimony regarding the business practices and subculture of pimps and prostitutes.

ER 702 provides that if "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as

an expert . . . may testify thereto in the form of an opinion or otherwise." ER 702. Expert testimony is admissible under ER 702 if the witness is qualified as an expert and if the testimony is helpful to the jury. State v. Groth, 163 Wn. App. 548, 562, 261 P.3d 183 (2011), review denied, 173 Wn.2d 1026 (2012). Expert testimony is helpful if it concerns matters beyond the common knowledge of the average layperson and is not misleading. Groth, 163 Wn. App. at 564. Courts generally interpret possible helpfulness to the trier of fact broadly and will favor admissibility in doubtful cases. Moore v. Hagge, 158 Wn. App. 137, 155, 241 P.3d 787 (2010) (quoting Miller v. Likins, 109 Wn. App. 140, 148, 34 P.3d 835 (2001)), review denied, 171 Wn.2d 1004 (2011).

Expert testimony must be relevant. In re Det. of Duncan, 142 Wn. App. 97, 109, 174 P.3d 136 (2007), aff'd, 167 Wn.2d 398, 219 P.3d 666 (2009). Testimony is relevant if it has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. The court must consider whether "relevant" evidence is "substantially outweighed by the danger of unfair prejudice." ER 403. The trial court has broad discretion in determining whether an expert's testimony is admissible under ER 702. In re Det. of McGary, 175 Wn. App. 328, 339, 306 P.3d 1005, review denied, 178 Wn.2d 1020 (2013). If the reasons for admitting or excluding the opinion evidence are fairly debatable, the trial court's exercise of discretion will not be reversed on appeal. Walker v. Bangs, 92 Wn.2d 854, 858, 601 P.2d 1279 (1979). In State v. Simon, 64 Wn. App. 948, 964, 831 P.2d 139 (1991), aff'd in part, rev'd in part, 120

Wn.2d 196, 840 P.2d 172 (1992), the court held that a detective's testimony regarding the relationship between a pimp and prostitute was helpful to the jury "because the average juror would not likely know of the mores" of the pimps and prostitutes.

Here, Abdulle does not dispute that Det. Banks qualified as an expert witness. Instead, he argues that Det. Banks's testimony was unhelpful and therefore irrelevant. Specifically, Abdulle contends the pimp and prostitute relationship Det. Banks described was unrelated to the trial evidence. He claims the record shows neither AP nor BI was recruited by Abdulle, that there was no agreement or understanding between them, that Abdulle did not advertise either victim on the internet, and that Abdulle did not impose any rules on AP or BI. Abdulle further argues that Det. Banks's testimony regarding common prostituting terminology was cumulative of testimony by AP and BI.

The trial court did not err in finding that Det. Banks's testimony was helpful here. See Simon, 64 Wn. App. at 964. Det. Banks's testimony provided context for the evidence. Contrary to Abdulle's assertions, the record supports an inference that Abdulle did have an agreement or understanding with AP and BI. Before Abdulle allowed AP to live with him and BI, he made sure she was willing to go on dates and give him a percentage of her earnings. AP had to convince Abdulle that she would not "run off" after he "put [her] on with a jug." Further, consistent with Det. Banks's testimony, the record supports an inference that Abdulle imposed some rules on AP and BI. AP testified that Abdulle forced BI out of the apartment because she would not comply with his payment demands.

She said that BI "didn't really want to give him enough money to stay" in the apartment. Abdulle also advertised AP. He instructed BI to take pictures of AP and said he would use them to "get things going from there." The cell phone data recovered from Abdulle's phone also showed that he used text messages to advertise AP and BI. The cell phone evidence was also consistent with Det. Banks's testimony regarding the importance of cell phones in the prostitution business.

Under these circumstances, the court did not abuse its discretion when it admitted Det. Banks's expert testimony. See Simon, 64 Wn. App. at 964.

Authenticity

Abdulle argues the trial court abused its discretion when it admitted cell phone data obtained using a universal forensic examination device. He claims the State failed to meet the authentication requirements of ER 901(a).

"The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." ER 901(a). Authentication of a process or system can consist of evidence "describing a process or system used to produce a result and showing that the process or system produces an accurate result." ER 901(b)(9). A proponent need only make a prima facie showing of authenticity. State v. Payne, 117 Wn. App. 99, 108-09, 69 P.3d 889 (2003), review denied, 150 Wn.2d 1028 (2004). This requirement is met "if sufficient proof is introduced to permit a reasonable trier of fact to find in favor of authentication or identification." State v. Danielson, 37 Wn.

-12-

App. 469, 471, 681 P.2d 260 (1984). The trial court is not bound by the rules of evidence when making a determination as to authenticity. State v. Bradford, 175 Wn. App. 912, 928, 308 P.3d 736 (2013), review denied, 179 Wn.2d 1010 (2014).

The State made a sufficient showing of authenticity here. Det. Washington testified to his extensive experience using the universal forensic examination device. He stated he used the device two to three times a week and had previously done so on "hundreds" of other occasions. He had extensive training with the device, including from trained FBI agents. Det. Washington testified that the device is designed to notify the user if it is not working properly or if an extraction attempt is unsuccessful.

Significantly, witness testimony corroborated the accuracy of the reports obtained by using the device. Det. Washington took the results of AP's phone extraction and had AP identify and verify the text messages from Abdulle or "Derrick." The results from BI's phone showing "Derrick's" phone number stored as "answer don't" was corroborated by BI's testimony that she had stored "Derrick's" number in her phone. This is sufficient proof to permit a reasonable trier of fact to find in favor of authentication or identification.

Abdulle's arguments to the contrary are unpersuasive. Abdulle cites two cases involving traffic radar guns to support the proposition that the State failed to show the device is reliable when functioning properly. See City of Bellevue v. Lightfoot, 75 Wn. App. 214, 877 P.2d 247 (1994), review denied, 125 Wn.2d 1025 (1995); City of Seattle v. Peterson, 39 Wn. App. 524, 693 P.2d 757 (1985).

These cases are inapposite. Det. Washington's testimony supported an inference that the device functioned properly. Unlike the cases cited by Abdulle, witness testimony corroborated the accuracy of the evidence at issue here.

Abdulle also contends that the court's reliance on Bradford is misplaced because the accuracy of the "phone dump" in that case was not directly at issue. Though Abdulle correctly argues that we did not address authenticity of the device used during the "phone dump" in that case, Bradford, 175 Wn. App. at 928 n.8, it does not follow that the State failed to authenticate the device used in this case. As discussed above, the record supports a prima facie showing of authenticity sufficient for ER 901(a). The trial court did not abuse its discretion when it admitted the reports.

Statement of Additional Grounds

Abdulle submitted a statement of additional grounds for review as permitted by RAP 10.10.

First, Abdulle argues the State failed to present sufficient probable cause to justify his warrantless arrest and the search warrant permitting the search of his apartment and vehicles. He contends the "informants"—AP and BI—lacked sufficient indicia of reliability to support probable cause.

When an officer bases his probable cause on an informant's tip, the State must present (1) circumstances establishing the informant's reliability or (2) some corroborative observation, usually by the officers, that shows either the presence of criminal activity or that the informer's information was obtained in a reliable fashion. State v. Z.U.E., 183 Wn.2d 610, 618, 352 P.3d 796 (2015).

-14-

AP and BI were not anonymous informants; their identities were known to Det. Washington, and he disclosed their identities to the court. They provided information that was corroborated and that had been obtained by reliable means. Both provided Det. Washington with facts based on personal experience. BI positively identified a photograph of Abdulle. AP identified Abdulle moments before he was arrested. These details are sufficient to support probable cause justifying a warrantless arrest. Z.U.E., 183 Wn.2d at 618. They are likewise sufficient to justify a search warrant. See State v. Lair, 95 Wn.2d 706, 709-10, 630 P.2d 427 (1981).

Second, Abdulle argues the trial court abused its discretion when it denied his motion for a bill of particulars. Count 1 of the amended information alleged that Abdulle advanced commercial sexual abuse of a minor, AP, between February 20 and March 14, 2013. Count 2 alleged he advanced commercial sexual abuse of a minor, BI, between February 1 and March 31, 2013. Before trial, Abdulle sought a bill of particulars to specify the acts allegedly committed on either count before March 2. Omar Artan, who lived in Abdulle's apartment, was arrested and taken into custody on March 2. Therefore, if the alleged acts had occurred before March 2, Abdulle could argue during trial that Artan committed the alleged crimes. The State explained that the reason it set the charging periods on those dates in the amended information is because the victims could not recall specific dates. Accordingly, the State estimated the charging period based on how old the victims were or on the general time period they recalled.

The court denied Abdulle's motion for a bill of particulars because the State lacked the information Abdulle sought.

The court did not abuse its discretion when it denied Abdulle's motion for a bill of particulars. A trial court acts within its discretion when it denies a motion for a bill of particulars "specifying matters which the prosecution is unable to furnish because of lack of information." 12 ROYCE A. FERGUSON, WASHINGTON PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 1904 (3d ed. 2004); see also State v. Brett, 126 Wn.2d 136, 157, 892 P.2d 29 (1995), cert. denied, 516 U.S. 1121 (1996).

Third, Abdulle claims the State improperly surprised defense counsel by injecting new evidence into the case midtrial. On one occasion documented in the record, defense counsel notified the court that during an interview with AP, he discovered information that created "a significant basis to believe that the description of the State's case is not accurate, and the defenses apply that were not obvious when the case was opened." Defense counsel did not describe this information, but asked the court to continue a recess to allow an opportunity to research the issue. The court denied defense counsel's request. On the second occasion, a witness, outside the presence of the jury, offered a statement made by Abdulle in a text message that the State allegedly had not disclosed to defense counsel. The State informed the court that it was the first time it had heard the exact words of the text message.

Abdulle repeatedly refers to these instances as "Brady violations" and suggests they caused prejudice. This argument does not warrant review.

Abdulle presents no meaningful reason to believe there was a violation of Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). The cited portions of the record do not indicate the State suppressed evidence favorable to him. Indeed, defense counsel never argued the State violated Brady. Abdulle only speculates the State violated Brady. Thus, he has failed to inform us of the "nature and occurrence of [the] alleged errors." RAP 10.10(c).

Fourth, Abdulle argues the court abused its discretion when it denied his motion to continue a recess under CrR 3.3. The grant or denial of a requested continuance will not be disturbed on appeal absent a showing of manifest abuse of discretion. State v. Terrovona, 105 Wn.2d 632, 651, 716 P.2d 295 (1986). Abdulle's request for a continuance occurred well into the trial. The court noted that it had already granted several recesses and the trial was well behind schedule. Abdulle claimed he needed a continuance because he discovered new evidence when interviewing a witness, and he needed time to determine the value of that evidence. But Abdulle had already interviewed that witness several times. The trial court believed Abdulle could investigate the evidence as the trial progressed. Under these circumstances, Abdulle has failed to show that the trial court based its decision on "untenable grounds, or for untenable reasons." State v. Blackwell, 120 Wn.2d 822, 830, 845 P.2d 1017 (1993).

Affirmed.

_Becker, J._

WE CONCUR:

_Trickey, ACJ_     _Schindler, J_