

2014 SEP 22 AM 8: 49

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | DIVISION ONE |
| Respondent, | ) | |
| | ) | No. 70358-7-I |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| WARREN EUGENE BELL, JR., | ) | |
| | ) | |
| Appellant. | ) | FILED: September 22, 2014 |
| | ) | |

DWYER, J. – After Warren Bell kicked and choked his wife, he drove away and then sent her a text message in which he called her a "bitch" and threatened to kill her. The jury found him guilty of assault in the second degree, felony harassment, and felony cyberstalking, and the trial court imposed an exceptional sentence. On appeal, we hold that sufficient evidence supports both charged alternative means of cyberstalking. We also reject Bell's claims that the ongoing pattern of abuse sentence aggravator is unconstitutionally vague and that he was denied effective assistance of counsel at sentencing. Bell's statement of additional grounds for review does not raise any meritorious issue. Accordingly, we affirm.

I

Warren Bell and Kimyata Bell married in 2000; they have two young sons. The couple's relationship was troubled, and Warren assaulted Kimyata several

times over the years. The couple separated in 2009 but continued to have some contact.

In August 2012, Kimyata was living in a house in Kent with her two children. James Denslow, Kimyata's nephew, was staying at the house temporarily. On August 6, Kimyata's boyfriend Gabe spent the evening with Kimyata and the children for a barbecue in the backyard.

After Gabe left, Kimyata and the children went inside. Sometime later, Kimyata heard a loud knock at the door and thought that Gabe might have returned. When she opened the door, Warren immediately reached out and grabbed her by the neck. He was angry, smelled of alcohol, and complained that the children had been calling Gabe "dad."

Kimyata turned and attempted to escape up the stairs. But Warren grabbed her by the hair and dragged her back down the stairs, where she hit her head on the concrete landing. Warren told the two boys, who were watching nearby and screaming, to "[g]et the fuck away; get the fuck away." He then put his hand down Kimyata's pants to see if she "smelt like another guy." At some point, the older boy called 911.

As Kimyata attempted to get up, Warren began kicking her in the head and chest and stomped on her rib cage. He eventually grabbed Kimyata's neck with both hands, choked her, and yelled, "you're going to die." Kimyata could hardly breathe and briefly lost consciousness.

Denslow returned to the house and heard "blood-curdling" screams as he went through the front door. He went downstairs and saw Warren with his hands around Kimyata's neck. Warren broke off his assault and chased Denslow into the front yard. After throwing a metal scooter towards Denslow, Warren got into a white van and drove away.

A short time later, Warren sent Kimyata the following text message:

Bitch i hope u show them this bitch u want to control me ill kill u and them whenever they don't know shit tell them to go home or else its on.

Dr. Larry Kadeg, an emergency room physician at Valley Medical Center, diagnosed Kimyata with abrasions to her neck and a chest wall contusion involving a possible rib fracture. Dr. Kadeg also noted petechiae around Kimyata's eyes, ruptured blood vessels associated with recent choking.

Warren claimed that he acted in self-defense. He testified that when he was at Kimyata's house on previous occasions, she repeatedly pestered him until he had sex with her. But he consistently declined Kimyata's requests to reconcile.

Warren maintained that on the evening of the alleged assault, he stopped by to drop off a birthday present for his younger son. Kimyata invited him in, and the two talked for a while. When he once again rebuffed Kimyata's efforts to resume their relationship, she became angry, "jumped" on his back and held on to him by his neck and shirt. Warren asserted that he had to scratch her and pull her hair in order to escape. He denied kicking or choking Kimyata. He explained

-3-

that the text was a "crude way" of explaining that "somebody was . . . commit[ting] a crime against me."

The State charged Warren with one count of assault in the second degree – domestic violence (count I), felony harassment – domestic violence (count II), and felony cyberstalking – domestic violence (count III). The jury found Warren guilty as charged.

The jury also returned special verdicts finding that all three counts involved domestic violence and were part of "an ongoing pattern of psychological or physical abuse." See RCW 9.94A.535(3)(h)(i). The jury further found that the assault and felony harassment counts were committed "within the sight or sound of the victim's children who were under the age of 18 years." See RCW 9.94A.535(3)(h)(ii).

Based on the aggravating factors, the court imposed a 120-month exceptional sentence on the assault count. The court imposed concurrent 60-month standard-range terms on the felony harassment and felony cyberstalking counts.

II

Bell contends that he was denied his right to a unanimous jury verdict because insufficient evidence supported one of the two charged alternative means of committing cyberstalking. The trial court instructed the jury that to convict Bell of cyberstalking, the State had to prove that, with the "intent to

harass, intimidate, or torment another person," Bell made an electronic communication:

> using lewd, lascivious, indecent, or obscene words, images, or language, or suggesting the commission of a lewd or lascivious act, **or**
>
> . . . threatening to inflict injury on the person of Kimyata Bell.

Instruction 38 (emphasis added). See RCW 9.61.260(1)(a), (c). "Evidence is sufficient if, when viewed in a light most favorable to the State, it permits any rational trier of fact to find the elements of the crime beyond a reasonable doubt." State v. Killingsworth, 166 Wn. App. 283, 286-87, 269 P.3d 1064, review denied, 174 Wn. 2d 1007 (2012).

Criminal defendants in Washington have the right "to an expressly unanimous *verdict*." State v. Ortega-Martinez, 124 Wn.2d 702, 707, 881 P.2d 231 (1994). "When a crime can be committed by alternative means, express jury unanimity as to the means is not required where each of the means is supported by substantial evidence." State v. Gonzales, 133 Wn. App. 236, 243, 148 P.3d 1046 (2006). In such circumstances, "we infer that the jury rested its decision on a unanimous finding as to the means." Ortega-Martinez, 124 Wn.2d at 708.

Bell asserts that his text message did not use "lewd, lascivious, indecent, or obscene words" or suggest the commission "of a lewd or lascivious act." He argues that the evidence was therefore insufficient to establish the alternative means of cyberstalking set forth in RCW 9.61.260(1)(a).

The court rejected a comparable challenge in <u>State v. Lansdowne</u>, 111 Wn. App. 882, 46 P.3d 836 (2002). In <u>Lansdowne</u>, the defendant telephoned a school secretary and threatened to send someone "to beat the shit" out of her daughter's teacher. The defendant also referred to the teacher as a "bitch." 111 Wn. App. at 887. Based on the call, the State charged Lansdowne with telephone harassment under RCW 9.61.230(1), which required proof that she used "lewd, lascivious, profane, indecent, or obscene words" or suggested "the commission of any lewd or lascivious act."

The trial court dismissed the charge, concluding that the use of the words "bitch" and "shit" could not establish the elements of the charge as a matter of law. On appeal, the court disagreed.

> "Indecent" is defined as: "not decent: . . . altogether unbecoming: contrary to what the nature of things for which circumstances would dictate as right or expected or appropriate: hardly suitable: unseemly." WEBSTER'S[ THIRD NEW INTERNATIONAL DICTIONARY], at 1147. "Obscene" is defined as: "marked by violation of accepted language inhibitions and by the use of words regarded as taboo in polite usage." WEBSTER'S, *supra,* at 1557. Ms. Lansdowne used the word "bitch" not in reference to a female dog, but in reference to a female human being. Such usage is both indecent and obscene as those words are commonly defined. A rational trier of fact could have determined that Ms. Lansdowne's words were indecent or obscene.

<u>Lansdowne,</u>111 Wn. App. at 891-92.

The analysis in <u>Lansdowne</u> is persuasive here. Warren used the terms "bitch" and "shit" in a comparable manner in his text message. A rational trier of

fact could have found those words to be indecent or obscene. Sufficient evidence supported his conviction for cyberstalking under RCW 9.61.260(1)(a).

### III

Bell contends that RCW 9.94A.535(3)(h)(i), the "ongoing pattern of psychological, physical, or sexual abuse" aggravator, is unconstitutionally vague and that his exceptional sentence must therefore be reversed. Bell concedes, however, that our Supreme Court has expressly held that "the due process considerations that underlie the void-for-vagueness doctrine have no application in the context of sentencing guidelines." State v. Baldwin, 150 Wn.2d 448, 459, 78 P.3d 1005 (2003). The court also determined that the sentencing guideline statutes do not create "a constitutionally protectable liberty interest." Baldwin, 150 Wn.2d at 461.

Bell maintains that Baldwin is no longer good law following the United States Supreme Court's decision in Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004). But Bell has not provided any cogent legal argument suggesting how Blakely, a decision firmly anchored in the Sixth Amendment right to a jury trial, has modified the due process vagueness analysis in Baldwin. Under the circumstances, former Chief Judge Easterbrook's trenchant observations in a similar context are also appropriate here:

> Plaintiffs say that a decision of the [United States] Supreme Court has "direct application" only if the opinion expressly considers the line of argument that has been offered to support a different approach. Yet few opinions address the ground that later opinions deem sufficient to reach a different result. If a court of appeals

could disregard a decision of the Supreme Court by identifying, and accepting, one or another contention not expressly addressed by the Justices, the Court's decisions could be circumvented with ease. They would bind only judges too dim-witted to come up with a novel argument.

Nat'l Rifle Ass'n of Am., Inc. v. City of Chicago, IL, 567 F.3d 856, 857-58 (7th Cir. 2009), rev'd on other grounds by McDonald v. City of Chicago, IL, 561 U.S. 742, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010). Under Baldwin, we must reject Bell's vagueness challenge. See State v. Gore, 101 Wn.2d 481, 486-87, 681 P.2d 227 (1984).

Moreover, the trial court based the exceptional sentence not only on the "ongoing pattern" of abuse factor, but also on the jury's finding that the offense occurred "within sight or sound of the victim's or the offender's minor child." RCW 9.94A.535(3)(h)(ii). During sentencing, the court observed that the latter factor, which Bell does not challenge, "affected me the most." The court also ruled that it would impose the same sentence based on either one of the aggravating factors. Bell's challenge to his exceptional sentence would therefore fail even if we invalidated the "ongoing pattern" of abuse aggravator. See State v. Gaines, 122 Wn.2d 502, 512, 859 P.2d 36 (1993) (appellate court will uphold exceptional sentence if convinced that the trial court would impose the same sentence on the basis of the valid factors).

IV

Bell contends that he received ineffective assistance of counsel when trial counsel failed to argue at sentencing that his assault and harassment convictions

constituted the "same criminal conduct" for purposes of calculating his offender score. See RCW 9.94A.589(1)(a). To prevail on this claim, Bell must establish both (1) that his attorney's representation fell below an objective standard of reasonableness, and (2) resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995); see also State v. Rattana Keo Phuong, 174 Wn. App. 494, 547, 299 P.3d 37 (2013), petition for review filed May 31, 2013.

At sentencing, the court calculated Bell's offender score at 15 for the assault conviction and 11 for the harassment and cyberstalking convictions. Defense counsel acknowledged that Bell's offender score for the assault conviction was 15 and that offender scores greater than 9 were "off the grid."

A determination that the assault and harassment convictions constituted the same criminal conduct would have reduced Bell's offender scores by two points. See RCW 9.94A.525. Because the standard range remains the same for offender scores of 9 or greater, a finding of same criminal conduct would not have affected the calculation of Bell's standard range or any other element of his sentence. See RCW 9.94A.510. Should Bell face a future sentencing, the trial court will have to make an independent determination of whether the convictions constituted the same criminal conduct. See RCW 9.94A.525(5)(a)(i). Consequently, Bell cannot demonstrate any prejudice resulting from defense counsel's failure to argue same criminal conduct, and his claim of ineffective

assistance fails. Because Bell cannot establish prejudice, we need not decide whether defense counsel's performance was deficient. See State v. Hendrickson, 129 Wn.2d 61, 78, 917 P.2d 563 (1996) (if ineffective assistance claim fails on one prong, court need not address other prong).

V

In his statement of additional grounds for review, Bell contends that he was denied effective assistance of counsel. He alleges that defense counsel failed to seek admission of Dr. Kadeg's prior inconsistent statements and failed to adequately cross-examine Dr. Kadeg.

Bell has not identified the nature of Dr. Kadeg's prior inconsistent statements or indicated how the evidence would have assisted defense counsel in cross-examining Dr. Kadeg. Nor has he provided any details about the remaining alleged errors. Because he has not sufficiently identified "the nature and occurrence of [the] alleged errors," we will not consider them. RAP 10.10(c).

Affirmed.

We concur:

-10-