# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 71311-6-I |
| Respondent, | ) ) | |
| | ) | DIVISION ONE |
| v. | ) ) | UNPUBLISHED OPINION |
| DAVID EARL WOODLYN, | ) ) | |
| Appellant. | ) ) | FILED: March 9, 2015 |

APPELWICK, J. — Woodlyn appeals his conviction for theft in the second degree. The State charged and the trial court instructed the jury on two alternative means of committing theft. He claims the evidence was insufficient to support one of the means so his conviction should be reversed. We can determine from the record that the jury's verdict was based on only one means and it is undisputed that substantial evidence supports that means. We affirm.

## FACTS

In the summer of 2011, Dora Kjellerson was in her mid-70s and living in her home in the White Center neighborhood in Seattle where she had resided for many years. A niece was staying with Kjellerson off and on during that summer. Family members were increasingly concerned about the decline in Kjellerson's mental status. For instance, Kjellerson would sometimes forget who her sister was or would get lost on walks around her neighborhood.

Kjellerson did her banking at the White Center branch of the Bank of America, which was walking distance from her house. Cynthia Cleary worked at the branch since 1998. In the summer of 2011, Cleary was the assistant branch manager and had noticed that Kjellerson was finding it increasingly difficult to remember things.

According to Cleary, Kjellerson had always been "very on top of her banking," but by 2011, she no longer knew how much money she had in the bank and appeared to be confused by changes in her balance amount.

David Woodlyn performed yard work around Kjellerson's neighborhood in the summer months to supplement his social security income. Woodlyn did not have a bank account at the White Center Bank of America branch, but he went there on occasion to cash checks written to him as payment for yard work. The amount of the checks generally ranged between $40 and $60. Sometime around August 2011, Woodlyn went to the White Center branch to cash a check written by Kjellerson. The amount of the check was less than $100. Because Kjellerson's signature on the check looked a "little off," Cleary called Kjellerson to verify that she wrote the check. Based on her conversation with Kjellerson, Cleary cashed the check.

On August 27, 2011, Woodlyn and Kjellerson came to the bank together. Although they approached a different teller window, Cleary saw them and stepped in to assist them. Woodlyn, speaking for Kjellerson, told Cleary they wanted to make a withdrawal from Kjellerson's account. When Cleary asked how much they needed to withdraw, Woodlyn responded, "How much does she have[?]" Cleary asked to speak to Woodlyn and Kjellerson in the lobby and told Woodlyn she would not provide that information. Woodlyn became agitated and appeared to want to leave with Kjellerson. To prevent him from doing so, Cleary took Kjellerson to the manager's office and called the police. Woodlyn left the bank. Cleary asked Kjellerson what the withdrawal was for, and Kjellerson said Woodlyn needed money to cut the grass. Kjellerson could not tell Cleary how much Woodlyn needed or how much she had already paid him.

2

King County Sheriff's Deputy Michael McDonald responded to the call from the bank. Kjellerson also told the deputy that she was withdrawing money that day so Woodlyn could mow her grass. When the deputy asked how much Kjellerson had already paid Woodlyn in the month of August, she said, "about $60." Deputy MacDonald drove Kjellerson home and noticed that the grass in her yard was overgrown and about a foot high.

After this incident, Bank of America investigated Kjellerson's account and discovered that during an approximately three week period in July and August 2011, Woodlyn cashed seven checks written from Kjellerson's account. The amounts of the initial checks were less than $100, but gradually rose to figures above $400 and the total amount of the checks exceeded $1,800.

Also following this incident, Kjellerson's sister obtained power of attorney over Kjellerson's accounts. And on September 9, 2011, geriatric mental health specialist Judith Newman evaluated Kjellerson. Newman concluded that Kjellerson was suffering from moderate to severe dementia. Newman determined that Kjellerson had "[n]o short term memory" and needed supervision. Newman described Kjellerson's deficits as obvious and said that "by about the second or third sentence somebody would know something was wrong."

Also in September 2011, a detective from the King County Sheriff's office and an investigator from Adult Protective Services attempted to interview Kjellerson about the money paid to Woodlyn in the previous two months. Kjellerson, however, was not able to answer their questions or even basic background questions.

The State charged Woodlyn with theft in the second degree alleging that he "did wrongfully obtain and exert unauthorized control" over property belonging to Kjellerson and did obtain control over such property by "color and aid of deception." See RCW 9A.56.020.

Woodlyn testified at trial that he met Kjellerson when he knocked at her door in 2011 and offered to mow her lawn. He said Kjellerson accepted his offer, he charged her $60 because her yard was large, and she paid him in cash.[1] Woodlyn said he returned to Kjellerson's home a few weeks later and spoke to a woman he assumed to be Kjellerson's daughter who paid him $90 to do additional yard work. Woodlyn said that on August 27, the yard needed to be mowed again, but Kjellerson did not have the money. Because Kjellerson said she could not remember where her bank was, he offered to take her. Woodlyn said he had cut Kjellerson's grass three to five times before that date. According to Kjellerson's niece, however, Kjellerson's yard was unmaintained and overgrown during that period in the summer of 2011.

With regard to the checks, Woodlyn testified that he cashed them as a favor to Kjellerson and gave the cash to her. Woodlyn admitted that he filled in his name and the amounts of the checks. He said he did other favors for Kjellerson, including purchasing cigarettes and groceries for her, and cleaning up her house on a couple of occasions. Kjellerman did not testify.

---

[1] Two other lawn customers who testified on Woodlyn's behalf said they paid him approximately half that amount to mow their yards.

The jury found Woodlyn guilty as charged.[2]

ANALYSIS

Woodlyn alleges a violation of his right to a unanimous verdict, because the State failed to present sufficient evidence to support both of the charged alternative means of committing theft.

In Washington, criminal defendants have a constitutional right to a unanimous jury verdict. WASH. CONST. art. I, § 21; State v. Ortega-Martinez, 124 Wn.2d 702, 707, 881 P.2d 231 (1994). "This right may also include the right to a unanimous jury determination as to the means by which the defendant committed the crime when the defendant is charged with (and the jury is instructed on) an alternative means crime." State v. Owens, 180 Wn.2d 90, 95, 323 P.3d 1030 (2014).

Alternative means statutes identify a single crime and provide more than one means of committing that crime. State v. Williams, 136 Wn. App. 486, 497, 150 P.3d 111 (2007). Theft is an alternative means crime. State v. Linehan, 147 Wn.2d 638, 644-45, 647, 56 P.3d 542 (2002); RCW 9A.56.020. With respect to each alternative means of committing theft set forth in the statute, the prohibited conduct varies significantly. State v. Peterson, 168 Wn.2d 763, 770, 230 P.3d 588 (2010).

Consistent with the information, the trial court's instructions required the jury to find that that Woodlyn committed the crime of theft by two alternative means: (1) wrongfully obtaining the property of another or (2) obtaining control over the property of

---

[2] A jury convicted Woodlyn following a second trial. The first trial ended in a mistrial after a juror disclosed personal knowledge of one of the State's witnesses midway through the trial.

5

another by color or aid of deception.[3]  These two means are commonly referred to as "theft by taking" and "theft by deception."  State v. Smith, 115 Wn.2d 434, 438, 798 P.2d 1146 (1990).  The instructions also informed the jury that it did not need to be unanimous as to the means relied upon.

When there is sufficient evidence to support each of the charged alternative means of committing the crime, express jury unanimity as to which means is not required.  Owens, 180 Wn.2d at 95.  "If, however, there is insufficient evidence to support any means, a particularized expression of jury unanimity is required."  Owens, 180 Wn.2d at 95.

In this case, the parties do not dispute the insufficiency of the evidence to establish that Woodlyn committed theft by "wrongfully obtaining" Kjellerman's property.  The State expressly concedes "[n]o evidence of theft by taking was presented to the jury."  And, indeed, the State did not allege that Kjelleman did not give the checks to Woodlyn or that she did not sign them.  Instead, the State advanced only the theory that, taking advantage of Kjellerman's compromised memory and diminished mental capacity, Woodlyn deceived her into believing she owed him payment for work.

---

[3] RCW 9A.56.020 defines the crime of theft and provides, in relevant part:

(1) "Theft" means:

(a) To wrongfully obtain or exert unauthorized control over the property or services of another or the value thereof, with intent to deprive him or her of such property or services; or

(b) By color or aid of deception to obtain control over the property or services of another or the value thereof, with intent to deprive him or her of such property or services.

But, the State argues that the defendant's constitutional right to a unanimous verdict is protected when, as here, the State presented argument and evidence as to only one means. State v. Witherspoon, 171 Wn. App. 271, 285, 286 P.3d 996 (2012), aff'd, 180 Wn.2d 875, 329 P.3d 888 (2014); see also State v. Johnson, 132 Wn. App. 400, 410, 132 P.3d 737 (2006) (general verdict on burglary will generally stand "[s]o long as there is sufficient evidence as to each means or so long as a reviewing court can tell that the verdict was based on only one means which was supported by substantial evidence"). Essentially, the State argues that the absence of express jury unanimity is harmless when the reviewing court can be assured that the verdict was not based on an unsupported alternative means.[4]

Error in the "to convict" instruction may be subject to a harmless error analysis. State v. DeRyke, 149 Wn.2d 906, 912, 73 P.3d 1000 (2003) (failure of to convict instruction to specify the degree of rape attempted was harmless because another instruction did so; therefore, the State was not relieved of its burden of proof). Even constitutional error related to a to convict instruction, such as the omission of an essential element, is harmless error if it is clear beyond a reasonable doubt that the error did not contribute to the verdict. Neder v. United States, 527 U.S. 1, 15, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999); State v. Thomas, 150 Wn.2d 821, 844, 83 P.3d 970 (2004), abrogated in part on other grounds by Crawford v. Wasington, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

---

[4] In Owens, our Supreme Court recently declined to "articulate a harmless error standard in the context of alternative means cases" finding no need to do so because in that case, sufficient evidence supported both means of trafficking in stolen property. Owens, 180 Wn.2d at 101.

This court has affirmed convictions in analogous cases where there was insufficient evidence to support a charged alternative means but the State did not argue or otherwise attempt to prove that means. For example, in State v. Rivas, 97 Wn. App. 349, 352, 984 P.2d 432 (1999), disapproved on other grounds by State v. Smith, 159 Wn.2d 778, 154 P.3d 873 (2007), the State charged the defendant with assault in the second degree. Because "assault" is not defined by the criminal code, courts use the common law to define the crime. Id. The trial court instructed the jury on three common law means of committing assault: (1) battery; (2) attempted battery; and (3) assault.[5] Id. at 352-53. Rivas argued and we agreed that no evidence was offered at trial to support battery or attempted battery. Id. at 351-52. However, the charging document alleged only that Rivas "held a knife to the [victim's] throat." Id. at 353. And, during argument, the State "focused only" on the third common law definition of assault. Id. On that record, we determined that the jury verdict was based entirely on one alternative means of committing assault, of which there was substantial evidence in the record. Id. at 354-55. We affirmed the conviction because "there was no danger that the jury's verdict rested on an unsupported alternative means." Id. at 355.

More recently, Division Two of this court considered a similar case where the jury was instructed on an unsupported means of committing the crime. Witherspoon, 171

---

[5] The Supreme Court disapproved of our decision in Rivas to the extent that it "can be read as endorsing a hard and fast rule that the common law definitions of assault constituted alternative means of committing assault, thereby requiring substantial evidence to support each of the alternative means charged or instructed." Smith, 159 Wn.2d at 787.

Wn. App. at 286-87.[6] In that case, the State charged the defendant with all three alternative means of witness tampering and the jury was instructed as to all three means. Id. at 285. The parties conceded that the State did not argue or attempt to prove one of the charged means, but there was substantial evidence to support the other two alternative means. Id. at 286-87. Based upon its determination that there was no danger the jury's verdict was based on the single unsupported alternative means, the court affirmed Witherspoon's conviction. Id. at 287.

Here also, the trial record shows that the State focused on proving only the "theft by deception" alternative. The prosecution's examination of witnesses during its case in chief developed facts related to Kjellerman's mental state, her apparent belief that she was paying Woodlyn for lawn maintenance work, and her lack of awareness as to how much she had already paid him. In closing argument, the prosecutor omitted the reference to the "theft by taking" alternative means when she read the to convict instruction to the jury and discussed only "theft by deception."

Nevertheless, Woodlyn argues that this court cannot tell whether the jury's verdict rested on the unsupported alternative means. Woodlyn points out that theft by wrongfully obtaining property of another requires proof of nonconsent. See State v. D.H., 31 Wn. App. 454, 458, 643 P.2d 457 (1982) ("[n]onconsent of the owner is an element of the crime of theft"). But, the court's instructions did not specifically inform the jury that Woodlyn could not wrongfully obtain Kjellerman's property unless he took her property without her consent. Accordingly, Woodlyn maintains that although the

---

[6] The Supreme Court's grant of review in Witherspoon did not encompass any issue specifically pertaining to his witness tampering conviction. Witherspoon, 180 Wn.2d at 882.

State did not seek to prove theft by taking, the instructions allowed the jury to rely on this alternative means. But, deception was the only basis for the jury to have concluded that Woodlyn's acceptance of Kjellerman's checks she voluntarily gave him was "wrongful." And as explained, alternative means are "distinct acts" that constitute the same crime. Peterson, 168 Wn.2d at 770. According to Woodlyn's argument, the jury would have to interpret theft by taking as indistinct from theft by deception.

The record amply demonstrates that the State's case against Woodlyn and the jury's verdict rested solely on proof that he obtained control of her property by color or aid of deception. And, because, as Woodlyn acknowledges, this alternative means was supported by sufficient evidence, any error was harmless.

We affirm.

WE CONCUR: