[No. 60412-6. En Banc. September 29, 1994.]

THE STATE OF WASHINGTON, *Respondent*, v. ALEJANDRO ORTEGA-MARTINEZ, *Petitioner*.

*Andrew P. Zinner* of *Washington Appellate Defender Association,* for petitioner.

*Dave Needy, Prosecuting Attorney,* for respondent.

*Lewis M. Schrawyer* on behalf of Washington Association of Criminal Defense Lawyers, amicus curiae for petitioner.

*Donald C. Brockett, Prosecuting Attorney for Spokane County,* and *Kevin M. Korsmo, Deputy; C. Danny Clem, Prosecuting Attorney for Kitsap County,* and *Pamela B. Loginsky, Deputy,* amici curiae for respondent.

UTTER, J. — Petitioner Alejandro Ortega-Martinez seeks reversal of an unpublished Court of Appeals decision affirming his conviction for second degree rape. A jury unanimously convicted Ortega-Martinez of second degree rape, but did not specify by which of two alternative means he committed the rape. Ortega-Martinez appealed, arguing he was entitled to a showing the jury unanimously agreed on the means by which he committed the rape. The Court of Appeals affirmed his conviction, reasoning under the authority of a recent United States Supreme Court decision that a defendant is not entitled to a showing of unanimity on the underlying means of committing the crime, notwithstanding Washington case law which has recognized such a right in some situations. Ortega-Martinez seeks review of whether a defendant has the right to a unanimous determination regarding the underlying means. Our law does recognize such a right when insufficient evidence supports a finding that a defendant committed a crime by any of the alternative means submitted to the jury; however, because sufficient evidence supported both alternative means submitted to the jury in this case, jury unanimity as to the means by which Ortega-Martinez committed the rape is not required. We therefore affirm Ortega-Martinez's conviction.

The victim of the rape was S.G., a 30-year-old woman with an IQ in the 40's. S.G. and her husband live in an "intensive tenant support program" which houses mentally retarded individuals and has staff available 24 hours a day. Verbatim Report of Proceedings, at 80. S.G. has a significant eating disorder which prevents her from knowing when to stop eating, Verbatim Report of Proceedings, at 81; cannot live independently, Verbatim Report of Proceedings, at 81; and suffers from an inability to resist the instructions of others, Verbatim Report of Proceedings, at 82. A caseworker works with S.G. and her husband 60 hours a week to ensure they receive support and education. Verbatim Report of Proceedings, at 84. S.G. also has an advocate who works closely with her and a case manager who monitors her development and general well-being.

On the evening of December 7, 1990, S.G. took a bus to Mount Vernon where her advocate was supposed to pick her up. Because of a mixup, the advocate did not meet her at the bus stop as planned, and S.G. waited "a long time". Verbatim Report of Proceedings, at 105. At some point while she was waiting, she was approached by the Defendant, Alejandro Ortega-Martinez. According to S.G., Ortega-Martinez told her to leave with him and she complied. She testified that after they walked together a long time and got into his pickup truck, Ortega-Martinez threatened to kill her if she did not remove her clothing. She described subsequent events which indicate sexual intercourse occurred between the two.

It is undisputed S.G. and Ortega-Martinez remained in the truck the rest of the night and that the next morning Ortega-Martinez walked her back to the bus station where he had found her. With the assistance of the Greyhound terminal manager, S.G. then called her advocate. After being returned home by the advocate, S.G. called her cousin. The cousin came to her house and, upon hearing what had happened, notified the police and took S.G. to the hospital. The doctor who examined S.G. found several small bruises on her neck, a bruise on her leg, and trauma to her vaginal area. Verbatim Report of Proceedings, at 152-55. The doctor testified the trauma to her vaginal area was consistent with injuries from penetration. Verbatim Report of Proceedings, at 157.

Ortega-Martinez was subsequently charged with violating RCW 9A.44.050, which defines second degree rape, Clerk's Papers, at 1, and tried by jury. The jury was instructed: "A person commits the crime of rape in the second degree when that person engages in sexual intercourse with another person by forcible compulsion or when the victim is incapable of consent by reason of being mentally incapacitated." Clerk's Papers, at 32. The jury returned a general verdict of guilty, Clerk's Papers, at 34, which the Court of Appeals affirmed in an unpublished opinion, *State v. Ortega-Martinez*, noted at 68 Wn. App. 1078 (1993). We accepted Ortega-Martinez's petition for review.

Although the jurors unanimously agreed Ortega-Martinez was guilty of second degree rape, they did not specify by which of the two alternative means — either by forcible compulsion or with someone incapable of consent by reason of mental incapacity — he committed second degree rape. Ortega-Martinez claims the absence of a special verdict form, requiring the jury to specify by which of the two alternative means it found him guilty, is reversible error.

■ Criminal defendants in Washington have a right to a unanimous jury verdict. Const. art. 1, § 21. This right includes the right to an expressly unanimous *verdict*. Const. art. 1, § 21 states: "The right of trial by jury shall remain inviolate, but the legislature may provide for a jury of any number less than twelve in courts not of record, and for a verdict by nine or more jurors in civil cases . . .". Allowing juries of less than 12 in courts not of record creates a right to 12-member juries in courts of record. *Seattle v. Filson*, 98 Wn.2d 66, 70, 653 P.2d 608 (1982), *overruled on other grounds by In re Eng*, 113 Wn.2d 178, 776 P.2d 1336 (1989). Additionally, by allowing verdicts of nine or more only in civil cases, the final clause implicitly recognizes unanimous verdicts are required in criminal cases. *State v. Stephens*, 93 Wn.2d 186, 190, 607 P.2d 304 (1980); *see also State v. Kitchen*, 110 Wn.2d 403, 409, 756 P.2d 105 (1988); *State v. Workman*, 66 Wash. 292, 295, 119 P. 751 (1911).

In certain situations, the right to a unanimous jury trial also includes the right to express jury unanimity on the *means* by which the defendant is found to have committed the crime. *State v. Green*, 94 Wn.2d 216, 616 P.2d 628 (1980); *accord State v. Whitney*, 108 Wn.2d 506, 739 P.2d 1150 (1987); *State v. Franco*, 96 Wn.2d 816, 639 P.2d 1320 (1982); *State v. Simon*, 64 Wn. App. 948, 831 P.2d 139 (1991).

■■ The threshold test governing whether unanimity is required on an underlying means of committing a crime is whether sufficient evidence exists to support each of the alternative means presented to the jury. If the evidence is *sufficient* to support each of the alternative means submitted to the jury, a particularized expression of unanimity as to the

means by which the defendant committed the crime is unnecessary to affirm a conviction because we infer that the jury rested its decision on a unanimous finding as to the means. *State v. Whitney*, 108 Wn.2d 506, 739 P.2d 1150 (1987); *State v. Franco*, 96 Wn.2d 816, 639 P.2d 1320 (1982); *State v. Arndt*, 87 Wn.2d 374, 553 P.2d 1328 (1976). On the other hand, if the evidence is *insufficient* to present a jury question as to whether the defendant committed the crime by any one of the means submitted to the jury, the conviction will not be affirmed. *State v. Green, supra; accord State v. Whitney, supra; State v. Franco, supra; State v. Simon, supra.*

The Court of Appeals erroneously concluded *Griffin v. United States*, 502 U.S. 46, 116 L. Ed. 2d 371, 112 S. Ct. 466 (1991) supersedes *Green* and is dispositive of Ortega-Martinez's state claims. The *Griffin* Court held that a general guilty verdict satisfies the due process clause of the fifth amendment to the federal constitution, notwithstanding an absence of unanimity on an underlying means supported by sufficient evidence. Since *Griffin* addressed the requirements imposed by the federal constitution, it does not erode the protections afforded by our state constitution and under *Green*.

Therefore, the first question we must answer in this case is whether sufficient evidence supported each of the two alternative means of committing second degree rape which were considered by the jury. Sufficient evidence is evidence adequate to justify a rational trier of fact to find guilt beyond a reasonable doubt. *Green,* at 220 (citing *Jackson v. Virginia*, 443 U.S. 307, 61 L. Ed. 2d 560, 99 S. Ct. 2781 (1979)). The evidence is sufficient if "after viewing the evidence in a light most favorable to the State, any rational trier of fact could have found the essential elements of the charged crime beyond a reasonable doubt". *State v. Rempel*, 114 Wn.2d 77, 82, 785 P.2d 1134 (1990).

As noted, the jury was informed of two alternative means by which second degree rape occurs. It was instructed to convict Ortega-Martinez if it found he had intercourse with S.G. by forcible compulsion or if it found he had intercourse

with her and she was incapable of consent by reason of being mentally incapacitated. Ortega-Martinez does not dispute sufficient evidence existed to support a finding he committed second degree rape by forcible compulsion. He argued to the Court of Appeals, however, there was insufficient evidence to support a finding he had intercourse with someone incapable of consent by reason of being mentally incapacitated.

The Court of Appeals agreed with Ortega-Martinez that the evidence was insufficient to find he had intercourse with someone incapable of consent by reason of being mentally incapacitated. In so doing, the court emphasized the definition of "mental incapacity" as a condition which: "prevents a person from understanding the nature or consequences of the act of sexual intercourse . . .". RCW 9A.44.010(4). The court intimated that a person's ability to testify about his or her verbal and physical attempts to prevent a rape manifests an "understanding" of the nature and consequences of the act of sexual intercourse and therefore renders inappropriate a finding that the person had a condition which prevented him or her from understanding the nature or consequences of sexual intercourse. *State v. Ortega-Martinez*, Court of Appeals cause 28297-2-I (Mar. 8, 1993), slip op. at 14.

█ We disagree with the Court of Appeals' interpretation of "understand". Since such a narrow interpretation would decrease the number of successful rape prosecutions, it would frustrate the legislative intent to increase, on appropriate evidence, the number of successful rape prosecutions generally.[1] Moreover, if such evidence were sufficient

---

[1]That intent is reflected in both the House and Senate history. The House Judiciary Committee commissioned and reviewed a report which indicated that of 208 rapes reported in Seattle in 1971, only 7 went to trial and only 2 resulted in convictions with prison sentences. House Bill 208, 44th Legislature (1975), House Judiciary Comm. file, "Is there a Need for Revision of the WA State Rape Law?" by Deborah Fleck, at 3 (June 25, 1974). Of the five versions of rape reform legislation before the House Judiciary Committee in 1975, the bill ultimately passed was the one considered by the analyst to be the one which dealt "most effectively with the rape problem". D. Fleck, at 3 (June 25, 1974).

The Senate Judiciary Committee likewise entertained testimony that "estimates of unreported rapes . . . range between 50-80%". House Bill 208, 44th Legislature (1975), Testimony by Mary Helen Roberts, executive director of the

to insulate a defendant from a charge of sexual assault under RCW 9A.44.050(1), the Legislature's manifest intent to protect the mentally disabled from sexual exploitation would be seriously undermined.

■ The Legislature's intent to provide broad protection for the mentally disabled is found in the legislative history of this statute. As noted, the enacted language defines "mental incapacity" as: "[a] condition . . . which prevents a person from understanding the nature or consequences of the act of sexual intercourse . . .". RCW 9A.44.010(4). In arriving at this language, the Legislature declined to enact at least four measures which were less protective of the mentally disabled than the statute ultimately enacted.

First, the Model Penal Code's section on rape (contained in the House's archival file) and an earlier Senate bill made sexual intercourse with a person incapable of consent by reason of being mentally incapacitated a *third* degree crime. Senate Bill 2063, 43d Legislature (1973); House Bill 208, 44th Legislature (1975), House File attach. 2A (Model Penal Code). The bill ultimately enacted made such action a *second* degree crime.

Second, some bills under consideration defined an individual to be mentally defective if he or she was incapable of appraising the nature of his or her "conduct" generally. *See* House Bill 208, 44th Legislature (1975), Senate Judiciary Comm. file, Mich. ESB 1207 (1974); House Bill 208, 44th Legislature (1975), House Judiciary Comm. file, Prosecuting Attorneys Ass'n proposal (1975); Senate Bill 31 73, 43d Legislature (1973). The language ultimately chosen by the Legislature permits a jury to find an individual mentally incapacitated if it finds he or she was incapable of appraising the nature of "sexual intercourse" specifically. The number of people who are so severely disabled that they cannot

*Washington State Women's Council, before the Senate Judiciary Comm.* (Feb. 17, 1975). Additionally, the Committee placed in its archival file an article which described the historical phenomenon of and reasons for excessive acquittals. House Bill 208, 44th Legislature (1975), Senate Judiciary Comm. file, *The Seattle Times* (Friday, Dec. 13, 1974, p. 75).

understand the nature of their general conduct is smaller than the number of people who are unable to understand the specific act of sexual intercourse. The adopted language thus reflects the Legislature's intent to provide protection to a broad class of people.

Third, under some earlier versions, a person could not have been considered mentally defective if the State failed to show he or she did not understand the *nature* of sexual intercourse — even if he or she did not understand the *consequences* of sexual intercourse. House Bill 208, 44th Legislature, Prosecuting Attorneys Ass'n proposal (1975); Senate Bill 3173, 43d Legislature (1973). The introduction of the words "or consequences" into the final legislation further demonstrates the Legislature's intent to expand the scope of persons falling within its protection.

Fourth, the House Judiciary Committee rejected a knowledge requirement for this category of second degree rape. To be convicted of rape of a mentally incapacitated person under the Model Penal Code as considered by the House Judiciary Committee in 1975, the defendant had to "know that [the victim] suffers from a mental disease or defect which renders her incapable of appraising the nature of her conduct". House Judiciary Comm. file; *cf.* Tex. Penal Code Ann. § 21.02(a), (b)(4) (West 1983). The version enacted by the 43d Legislature rejects an express knowledge requirement.

■ The key to a proper interpretation of RCW 9A.44.010(4) is a sufficiently broad interpretation of the word "understand". Evidence showing that a victim has a superficial understanding of the act of sexual intercourse does not by itself render RCW 9A.44.010(4) inapplicable. A finding that a person is mentally incapacitated for the purposes of RCW 9A.44.010(4) is appropriate where the jury finds the victim had a condition which prevented him or her from *meaningfully* understanding the nature or consequences of sexual intercourse.

A meaningful understanding of the nature and consequences of sexual intercourse necessarily includes an under

standing of the physical mechanics of sexual intercourse. *See* RCW 9A.44.010(1) (broadly defining the physical acts considered to be sexual intercourse). It also includes, however, an understanding of a wide range of other particu-lars. For example, the nature and consequences of sexual intercourse often include the development of emotional intimacy between sexual partners; it may under some circumstances result in a disruption in one's established relationships; and, it is associated with the possibility of pregnancy with its accompanying decisions and consequences as well as the specter of disease and even death. While the law does not require an alleged victim to understand any or all of these particulars before a defendant can be considered insulated from liability under RCW 9A.44.050(1)(b) for having had sexual intercourse with a mentally incapacitated individual, all of the above are elements of a meaningful understanding of the nature and consequences of sexual intercourse and are important for a trier of fact to bear in mind when it is evaluating whether a person had a condition which prevented him or her from having a meaningful understanding of the nature or consequences of the act of sexual intercourse. They are especially important to acknowledge in prosecutions involving the mentally disabled because such individuals may have a condition which permits them to have a knowledge of the basic mechanics of sexual intercourse, but no real understanding of either the encompassing nature of sexual intercourse or the consequences which may follow.

In a subsequent case, the Court of Appeals has recognized the need to interpret "understand" consistently with the legislative aims of protecting the mentally disabled and of deterring and punishing the crime of rape. *State v. Summers*, 70 Wn. App. 424, 432, 853 P.2d 953, *review denied*, 122 Wn.2d 1026 (1993) involved the prosecution of a man for second degree rape of a 44-year-old, mentally ill woman. The victim met the defendant on a public street. After talking to the victim and telling her to follow him, the defendant took her inside a private apartment and proceeded to have sexual

intercourse with her. Although the victim knew a baby was a result of a man "put[ting] a wiener in you", she spoke in fragmented and confusing sentences, had no knowledge of sexually transmitted diseases, thought a penis was a tail, and did not know how to read. Holding the jury had sufficient evidence from which to conclude the victim did not understand the nature or consequences of sexual intercourse, the Court of Appeals affirmed the defendant's conviction. It wrote: "The evidence showed that [the victim] had a basic understanding of the mechanical act of sexual intercourse, but this should not be equated with an understanding of its nature and consequences." *Summers*, at 432.

Other courts have also held a superficial understanding of the physical nature and consequences of sexual activity insufficient by itself to void the applicability of provisions defining mental incapacity in a way similar to the way it has been defined in RCW 9A.44.010(4):

> An understanding of coitus encompasses more than a knowledge of its physiological nature. An appreciation of how it will be regarded in the framework of the societal environment and taboos to which a person will be exposed may be far more important.

(Citation omitted.) *People v. Easley*, 42 N.Y.2d 50, 56, 364 N.E.2d 1328, 396 N.Y.S.2d 635 (1977). *See also State v. Soura*, 118 Idaho 232, 796 P.2d 109 (1990); *People v. McMullen*, 91 Ill. App. 3d 184, 414 N.E.2d 214 (1980).

For these reasons, we reject the narrow interpretation of "mental incapacity" implicit in the Court of Appeals' decision in this case.

An examination of the record when viewed pursuant to our interpretation of "understanding the nature or consequences of the act of sexual intercourse" establishes the State presented sufficient evidence to permit a finding that S.G. was incapable of consent by reason of being mentally incapacitated. We, therefore, disagree with the Court of Appeals' conclusion the State "presented no evidence that [S.G.'s mental retardation] prevented [her] from understanding the nature or consequences of sexual intercourse."

See *State v. Ortega-Martinez*, Court of Appeals cause 28297-2-I) (Mar. 8, 1993), slip op. at 15.

In assessing whether the State has met its burden of showing that a victim had a condition which prevented him or her from understanding the nature or consequences of sexual intercourse at the time of an incident, the jury may evaluate, in addition to that person's testimony regarding his or her understanding, other relevant evidence such as the victim's demeanor, behavior, and clarity on the stand. It may also take into consideration a victim's IQ, mental age, ability to understand fundamental, nonsexual concepts, and mental faculties generally, as well as a victim's ability to translate information acquired in one situation to a new situation.

In this case, S.G.'s testimony regarding sexual intercourse reflected her extremely limited understanding of the nature and consequences of sexual intercourse. Although she associated sperm with "disease", Verbatim Report of Proceedings, at 120, and the doctor testified S.G. seemed to understand the implication of disease during a discussion he had with her after he conducted his examination of her, Verbatim Report of Proceedings, at 156, these facts are not dispositive. S.G.'s understanding of the meaning of disease after the incident is not conclusive as to whether she understood the nature and consequences of sexual intercourse at the time of the incident. Furthermore, the exchange between the prosecutor and S.G. reflected a suspect understanding of the underlying connection between sperm and disease even after the incident. S.G. seemed to believe that if she did not talk about sperm, any disease associated with sperm would not harm her. Verbatim Report of Proceedings, at 120.

S.G.'s caseworker presented uncontroverted evidence that S.G. had an IQ in the 40's; testified the IQ below which a person is considered mentally retarded is 69; and estimated S.G.'s mental age to be between the ages of 5 and 9, Verbatim Report of Proceedings, at 79. A police officer with experience in child abuse cases testified S.G.'s mental age seemed close to that of a 4- or 5-year-old. Verbatim Report of

Proceedings, at 33. He also testified S.G. was unable to tell him where she had gotten off the bus. Verbatim Report of Proceedings, at 35. The doctor testified S.G. described the incident as "He kept pushing me and pushing me", Verbatim Report of Proceedings, at 150, and was unable to describe to him when her last menstrual period had been, Verbatim Report of Proceedings, at 152. S.G. herself testified she could not read. Verbatim Report of Proceedings, at 103.

The jury also had occasion to draw its own conclusions about S.G.'s mental capacity. It observed a 30-year-old woman who exhibited the skills of a child and whose answers were often nonresponsive. When the prosecutor asked her for clarification concerning her comment that there "was something in the coffee", she stated "There was something underneath the blanket". When he asked if she had ever seen Ortega-Martinez before that night, she replied, "When I leave for him". Verbatim Report of Proceedings, at 115. When she was asked how long she stayed in the truck, she replied "It was raining". Verbatim Report of Proceedings, at 113. In response to a question "Where did you go after you went over the railroad tracks?", she testified "I saw the green barn and red barn". Verbatim Report of Proceedings, at 107. The jury also observed S.G.'s generally deficient understanding of other matters. She was unable to assess the fundamental, nonsexual concept of time. She could not remember when she had been raped. Upon a specific question asking her to relate it to Christmas, she thought it was after Christmas, despite the fact the rape occurred on December 7, 1990. Verbatim Report of Proceedings, at 104. She was also unable to estimate in minutes or hours how long she waited at the bus stop: "waited for a long time" was as specific as she was able to get. Verbatim Report of Proceedings, at 105. Her vocabulary and syntax also reflected her mental deficiencies. S.G. did not understand the meaning of the word "position", Verbatim Report of Proceedings, at 125, and spoke in childlike language when referring to sexual organs, using the term "gina" for vagina and "boops" for breasts, Verbatim Report of Proceedings, at 109.

■ In addition to the above evidence supporting a finding that S.G. had a condition which prevented her from meaningfully understanding the nature or consequences of sexual intercourse *generally*, the jury heard ample evidence from which it could properly have concluded S.G. had a condition which prevented her from understanding the nature or consequences of sexual intercourse *at the time of the offense*. It is important to distinguish between a person's *general* ability to understand the nature and consequences of sexual intercourse and that person's ability to understand the nature and consequences at a given time and in a given situation. This treatment of the two as identical contradicts the express language of the statute. RCW 9A.44.010(4) specifically notes " '[m]ental incapacity' is that condition existing *at the time of the offense* which prevents a person from understanding the nature or consequences of the act of sexual intercourse . . .." (Italics ours.) *See also State v. McDowell*, 427 So. 2d 1346 (La. Ct. App. 1983) (notwithstanding that victim, as a married woman and mother of children, obviously experienced intercourse and knew what it meant, the victim was incapable of understanding the nature of the act on the day of the act).

The evidence supporting a finding that S.G. had a condition which prevented her from understanding the nature or consequences of sexual intercourse at the time of the incident includes the following. S.G.'s case manager testified, "If you teach her something in one situation, she wouldn't necessarily understand that same thing applied in another situation unless she experienced that". Verbatim Report of Proceedings, at 85. Although S.G. sometimes understood the harm of talking to strangers after attending special training sessions, that ability dissipated quickly. Verbatim Report of Proceedings, at 87-88. Likewise, although S.G. knew generally how to dial 911 in the case of an emergency, this capacity was limited when she was not in her own apartment. Verbatim Report of Proceedings, at 85-86.

Viewing the evidence in a light most favorable to the State, a rational trier of fact could have found beyond a

reasonable doubt that S.G. had a condition which prevented her from meaningfully understanding the nature or consequences of sexual intercourse on the evening she met Ortega-Martinez and that she was therefore incapable of consent by reason of mental incapacity. We, therefore, disagree with the Court of Appeals' holding that the evidence was insufficient to prove S.G. incapable of consent. Because sufficient evidence supports both alternative means of committing second degree rape, Ortega-Martinez did not have a right to express unanimity on one or the other means. His conviction is affirmed on different grounds from those stated by the Court of Appeals.[2]

DOLLIVER, SMITH, GUY, JOHNSON, and MADSEN, JJ., concur.

ANDERSEN, C.J. (concurring in the result) — I write separately because I believe the majority opinion's interpretation of "mental incapacity", as that term is used in RCW 9A.44.010(4), is unnecessarily broad.

Rape in the second degree may occur when a person engages in sexual intercourse with another when "the victim is incapable of consent by reason of being . . . mentally incapacitated". RCW 9A.44.050(1)(b). The statute then defines "mental incapacity" as

> that condition existing at the time of the offense which prevents a person from understanding the nature or consequences of the act of sexual intercourse whether that condition is produced by illness, defect, the influence of a substance or from some other cause.

RCW 9A.44.010(4).

The majority would have the trial court "bear in mind" a number of factors which are purportedly relevant in determining whether an allegedly disabled victim has a meaningful understanding of the nature and consequences of the act of sexual intercourse.

---

[2]We strongly urge counsel and trial courts to heed our notice that an instruction regarding jury unanimity on the alternative method is preferable. *State v. Whitney*, 108 Wn.2d 506, 511, 739 P.2d 1150 (1987).

In the majority's view, these factors would be reviewed when determining whether a victim has a condition which prevents understanding of the nature and consequences of sexual intercourse.

Thus, the trial court must decide the extent of the victim's understanding of the nature and consequences of sexual intercourse in order to determine whether the victim has a *condition* which prevents such an understanding. This is circular reasoning.

I disagree with the majority opinion to the extent that it can be interpreted to require a trial court to conduct an in-depth review of the level of an allegedly disabled victim's understanding of the emotional impact that sexual intimacy can cause, of the possibility that such intimacy may have an effect on existing relationships, and of the extent of the victim's knowledge of the "specter of disease and even death" associated with the possibility of pregnancy. Majority, at 712. To my view this "evaluation" is unwarranted under the facts of this case.

It is unnecessary in this case to construe the act as broadly as the majority does, for it is clear from the evidence presented to the jury, see majority, at 714-16, that the victim in this case suffered from a mental condition that prevented her "from understanding the nature or consequences of the act of sexual intercourse". RCW 9A.44.010(4).

BRACHTENBACH and DURHAM, JJ., concur with ANDERSEN, C.J.