IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 32543-1-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JAMES FURR, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

FEARING, J. — James Furr claims insufficient evidence supported his conviction for second degree rape. We disagree and affirm his conviction. Furr also contends that the trial court erroneously failed to conduct an inquiry as to his ability to pay legal financial obligations. We exercise our discretion and decline to review this second assignment of error.

FACTS

Victim Rita Evans was born in 1980 and, starting in first grade, required special education services. In 1999, Evans gave birth to a son. At six months old, her son was placed in the care of Evans' older brother. After taking classes within the special

education program, Evans graduated from high school in 2000. In 2001, a physician diagnosed Evans with fetal alcohol syndrome. Despite her mental disability, Evans worked in jobs as a server, preparation cook, dishwasher, courtesy clerk, and housecleaner. In 2014, Evans, age 33, lived with her father and step-mother in Cle Elum.

Beginning in 2006, John and Diane Furr resided in the house adjacent to Rita Evans and her parents. Diane earlier met Evans when Evans worked as a courtesy clerk at the grocery store where Diane shopped. John and Diane Furr became friends with Evans, and the couple treated Evans like a daughter.

In November 2013, defendant James Furr left prison in Pennsylvania and arrived in Cle Elum to live with his brother John. Within a week of his advent, James met Rita Evans. John Furr declared to his brother: "She's [Evans is] a 34-year-old woman with the mentality of a 12-year-old, [so] don't mess with her." Report of Proceedings (RP) at 179.

On January 11, 2014, Rita Evans visited the Furrs' residence. James and John Furr watched a Seahawks football game while Evans painted Diane Furr's nails. Diane departed the home to shop, and Evans soon joined John and James on the couch. James went to the store, purchased alcohol, and returned home where the three imbibed. During a commercial break, James Furr exited to the back deck to smoke a cigarette. He invited Evans, who also smoked, to join him, and she accepted. John Furr continued watching the football contest until he heard a loud thump on the deck. John went to the kitchen

2

window, peered outside to the deck, and saw James and Evans engaged in sexual intercourse. John stormed onto the deck and confronted James. The three reentered the home, where John continued to berate James while Evans curled up on a couch. Diane Furr returned home twenty minutes later. Diane confronted James, who denied any sexual activity. Diane removed James from the home.

Diane Furr comforted a hushed Rita Evans and questioned her about the incident. Evans said: "Jimmy assaulted me," which prompted John Furr to call Evans' parents. RP at 201. Rod Evans and Janice Barnhart, Evans' father and step-mother, arrived and called 9-1-1. Police escorted Evans to Kittitas Valley Community Hospital for a sexual assault examination. The exam detected James Furr's seminal fluid around Evans' vagina and anus.

## PROCEDURE

The State of Washington charged James Furr with second degree rape. During the jury trial, the State presented evidence that Rita Evans lacked the ability to consent because of her mental incapacity. The jury heard testimony from Evans, John Furr, Diane Furr, Janice Barnhart, the nurse who performed the sexual assault examination at Kittitas Valley Community Hospital, the police officer who responded to the 9-1-1 call, the DNA (deoxyribonucleic acid) forensic lab technician, and Dr. Paul Connor, a clinical psychologist. James Furr testified on his own behalf as the sole defense witness.

The questioning of Rita Evans by the prosecution regarding the nature of sex

3

No. 32543-1-III
*State v. Furr*

included these colloquies:

Q  Rita, do you know what sex is?
A  Yes.
Q  What is sex?
(Inaudible) body parts sex involves?
A  Vagina and penis.
Q  When—when do people have sex?
Do you know, Rita?
A  I don't (inaudible).

RP at 92-93.

Q  . . . [W]hat is sex, basically?  Can you just sum it up for me?
A  Intercourse.
Q  Intercourse.  And what does that mean?
A  Vagina and penis.
Q  Okay.  The—Something happens between them, right?
A  Uh-huh.
Q  Okay.  Do you mind telling us exactly what happens?—you think that's a difficult—?
A  Yeah.
Q  Okay.  Let me ask you this, Rita.  Do you know, though, do you know—exactly what sex is?
A  Yes.
Q  Okay.  You know.
     What do you think about—You have been in love, then.  You were in love with David?
A  Yes.
Q  And, do you think that there's any—any connection between being in love with someone and having sex?
A  Yes.
Q  Yes.  Do you think that's—that's good?
A  If it's the right person.
  . . . .
Q  . . . Who [sic] do women become pregnant?
A  It's usually unprotected sex.
Q  Uh-huh.  And what do you mean by protected or unprotected?
A  Protected is using a condom.  Unprotected isn't using a condom.
  . . . .

4

Q ... What are STDs?
A Sexually—transmitted diseases.
Q And what are some examples of those? What are sexually transmitted diseases?
A Herpes, AIDS, gonorrhea—

. . . .

Q ... You told us a couple times that—that you were sexually assaulted. Can you tell me what you meant by that?
A I didn't give my okay.

RP at 103-06.

Janice Barnhart, John Furr, and Diane Furr each testified regarding Rita Evans' mental faculties. The three witnesses concurred that Evans is suggestible and had the mental capacity of a youth. Officer Kirk Bland, who responded on the night of the incident, and Connie Johnson, the nurse who performed the sexual assault examination, respectively testified that, during each's short interaction with Evans, he or she concluded Evans experienced mental disabilities.

Dr. Paul Connor testified as an expert on fetal alcohol spectrum disorder and gave the results of an evaluation of Evans. As part of the testing, Connor reviewed Evans' prior medical history, personally examined Evans, and interviewed family regarding Evans' daily functioning. Dr. Connor opined that Evans had an IQ (intelligence quotient) of 65, a mental age of seven years and seven months, and impairments consistent with fetal alcohol spectrum disorder.

On cross-examination, Dr. Paul Connor testified:

Q Okay.
Of course she is mechanically able to have sex; we know that.

5

> Is she able to consent to sex?
> A Again, that wasn't a question that was asked of me.
> Q Okay.
> Can you necessarily say that she's not able to consent to sex?
> A I can say that her levels of impairment in these areas that we talked about of her problem-solving, her decision-making, her suggestibility and her understanding of emotional content make her very prone to being victimized, and to—to the victimization and being taken advantage of by others.

RP at 383-84.

The jury found James Furr guilty of second degree rape, and the trial court sentenced him to one hundred months' confinement. The court also ordered $2,705.89 in legal financial obligations with payments to commence one month after release from incarceration. The obligations consisted of a $500.00 victim assessment, $200.00 court costs, $1,000.00 defense costs, $100.00 crime lab fee, $100 DNA collection fee, $50.00 booking fee, and $755.89 in restitution.

During the sentencing hearing, James Furr and the trial court engaged in the following colloquy before the court imposed financial obligations:

> THE COURT: . . .
> And financial obligations total $2,705.81 [sic]. And that shall be paid at $100 per month commencing one month after you are released from incarceration.
> I don't know what your (inaudible) will be at that point. (Inaudible)
> DEFENDANT: I'm—if I'm too old or too weak and my (inaudible) I don't have to pay it, right? I can just go on and—hopefully I—I mean, if I'm unable to work at that time—'cause, I mean, I'm 54, and—like—said—haven't had a physical in twenty-some years, so—know what's going on inside of my body,—
> THE COURT: Right.
> DEFENDANT:—but—(inaudible) work at that time.

6

It's—

THE COURT: All right. Well,—

DEFENDANT:—don't have to worry about going back to jail again, do I?

THE COURT: Right now there's no reason to think that there's anything—

DEFENDANT: Yes. You're right, Ma'am.

THE COURT:—body, and we will cross that bridge when you come to it. Right now you are able-bodied and strong and—and intelligent, and—

DEFENDANT: I don't know about intelligent,—strong—

THE COURT: When you are released from incarceration then— certainly see what your employment—

RP at 594.

## LAW AND ANALYSIS

On appeal, James Furr contends that the evidence did not support a conviction for second degree rape for two distinct reasons. First, the evidence indisputably showed that the victim had capacity to consent to sex. Second, the evidence conclusively established that Furr believed the victim capable of granting consent. Furr also argues that, assuming we affirm his conviction, the prosecution must be remanded for another sentencing hearing because the trial court failed to engage in an individual inquiry as to whether he possessed the current or future ability to pay legal financial obligations.

### Victim Mental Capacity

James Furr challenges the sufficiency of the evidence for his conviction for second degree rape. Evidence is sufficient if a rational trier of fact could find each element of the crime beyond a reasonable doubt. *State v. Green*, 94 Wn.2d 216, 221-22, 616 P.2d

7

628 (1980). Both direct and indirect evidence may support the jury's verdict. *State v. Brooks*, 45 Wn. App. 824, 826, 727 P.2d 988 (1986). This court draws all reasonable inferences in favor of the State. *State v. Partin*, 88 Wn.2d 899, 906-07, 567 P.2d 1136 (1977). Only the trier of fact weighs the evidence and judges the credibility of witnesses. *State v. Carver*, 113 Wn.2d 591, 604, 781 P.2d 1308, 789 P.2d 306 (1989).

RCW 9A.44.050 establishes the crime of second degree rape. The statute reads, in part:

> (1) A person is guilty of rape in the second degree when, under circumstances not constituting rape in the first degree, the person engages in sexual intercourse with another person: . . . (b) When the victim is incapable of consent by reason of being physically helpless or mentally incapacitated.

We must determine if the evidence permitted the jury to conclude that Rita Evans lacked the mental capacity to consent to sexual intercourse.

Mental incapacity is "that condition existing at the time of the offense which prevents a person from understanding the nature or consequences of the act of sexual intercourse whether that condition is produced by illness, defect, the influence of a substance or from some other cause." RCW 9A.44.010(4). "Understanding" should be broadly interpreted. *State v. Ortega-Martinez*, 124 Wn.2d 702, 711, 881 P.2d 231 (1994). A superficial understanding of the act of sexual intercourse does not by itself render RCW 9A.44.010(4) inapplicable. *Ortega-Martinez*, 124 Wn.2d at 711.

A meaningful understanding of the nature and consequences of sexual intercourse

8

requires an understanding of the physical mechanics, but may also include understanding the development of emotional intimacy between sexual partners, the potential disruption of established relationships, the possibility of pregnancy, and the specter of disease and even death. *Ortega-Martinez*, 124 Wn.2d at 711-12; *State v. Summers*, 70 Wn. App. 424, 432, 853 P.2d 953 (1993). These elements are important for a trier of fact to bear in mind during "prosecutions involving the mentally disabled because such individuals may have a condition which permits them to have a knowledge of the basic mechanics of sexual intercourse, but no real understanding of either the encompassing nature of sexual intercourse or the consequences which may follow." *Ortega-Martinez*, 124 Wn.2d at 712.

In assessing whether the State has met its burden to prove charges of second degree rape, the jury may evaluate, in addition to the victim's testimony regarding his or her understanding, other relevant evidence such as the victim's demeanor, behavior, and clarity on the stand. *Ortega-Martinez*, 124 Wn.2d at 714. The jury may also consider the victim's IQ, mental age, and ability to understand fundamental nonsexual concepts. *Ortega-Martinez*, 124 Wn.2d at 714.

In *State v. Ortega-Martinez*, 124 Wn.2d 702 (1994), the jury convicted Alejandro Ortega-Martinez for second degree rape under RCW 9A.44.050. The victim was a thirty-year-old woman with an IQ in the 40s. She was married but lived in a housing program for individuals with mental disabilities. Ortega-Martinez approached the victim while

9

she waited at a bus stop, he took her to his pickup truck, threatened to kill her if she did not remove her clothes, and forced her to have sexual intercourse. The victim, a doctor, and the victim's case manager all testified at trial.

The testimony in *Ortega-Martinez* established that the victim possessed a mental age between five and nine years old and a limited understanding of the correlation between sex and disease. The victim could not read, used childish words for sexual organs, and uttered nonresponsive answers during trial. Our Supreme Court held that the State presented sufficient evidence for a rational trier of fact to find beyond a reasonable doubt that the victim had a condition rendering her unable to consent to sexual intercourse at the time of the incident.

In *State v. Summers*, 70 Wn. App. 424 (1993), John Summers argued insufficient evidence supported his conviction for second degree rape, since evidence failed to show the victim could not consent due to mental incapacity. The victim was a 44-year-old women that lived in a group care facility for the mentally ill. Summers invited her into an apartment where she had sexual intercourse with Summers. The victim testified that she lacked knowledge of sexually transmitted diseases except for AIDS (acquired immune deficiency syndrome), which occurs "[w]hen a man puts a wiener in you and you get it from them." *State v. Summers*, 70 Wn. App. at 431. She also testified: "[w]hen a man puts a wiener in you and the sperm comes inside of you and you have the baby . . . [and it] [c]omes out of like your stomach or something like that." *State v.*

10

*Summers*, 70 Wn. App. at 431. The victim never attended sex education classes and believed her period was "[w]here your sick time comes." *State v. Summers*, 70 Wn. App. at 432. She spoke in fragmented and confusing sentences, thought a penis was a tail, and could not read or tell time. She possessed a basic understanding of the mechanical act of sexual intercourse and understood sex as something a husband and wife perform in order to beget a baby. This court held that the testimony, when viewed in a light most favorable to the State, allowed a rational trier of fact to conclude beyond a reasonable doubt that the victim was mentally incapacitated.

James Furr's prosecution presents a closer case. Rita Evans' testimony showed she possessed a broader understanding of the nature of sex than the victims in *State v. Summers* and *State v. Ortega-Martinez*. Evans was more articulate than the other victims. Nevertheless, providing a correct technical answer does not necessarily substantiate a meaningful understanding of the nature and consequences of sex. Although more coherent than other victims, Evans' answers remained short and sometimes incomplete.

Despite the stronger evidence favoring James Furr, we conclude the State presented sufficient evidence for a rational jury to find Rita Evans mentally incapacitated as defined under RCW 9A.44.010(4). When hearing and observing Evans, the jury encountered an opportunity to evaluate her mental capacity. Witnesses confirmed Evans' suggestibility and described her as possessing the mental capacity of a youth. Expert

clinical psychologist Paul Connor averred that Evans had an IQ of sixty-five, a mental age of seven years and seven months, and impairments consistent with fetal alcohol spectrum disorder.

James Furr contends that Dr. Paul Connor testified that he could not state whether Rita Evans could consent to sex. We disagree. Connor rendered no such denial. Connor instead stated he had not been asked to address the question. He added that Evans' impairments rendered her prone to victimization.

### Knowledge of Low Mental Capacity

James Furr next argues that no rational jury could conclude that he believed Rita Evans to be mentally incapacitated. RCW 9A.44.030(1) declares:

> In any prosecution under this chapter in which lack of consent is based solely upon the victim's mental incapacity or upon the victim's being physically helpless, it is a defense which the defendant must prove by a preponderance of the evidence that at the time of the offense the defendant reasonably believed that the victim was not mentally incapacitated and/or physically helpless.

When a defendant must establish a defense by a preponderance of the evidence, the appropriate standard of review is whether, considering the evidence in the light most favorable to the State, a rational trier of fact could have found that the defendant failed to prove the defense by a preponderance of the evidence. *State v. Lively*, 130 Wn.2d 1, 17, 921 P.2d 1035 (1996). No Washington decision addresses whether sufficient evidence supported a trier of fact's rejection of the defense for second degree rape.

We also reject James Furr's contention that no reasonable jury could find that he

12

held knowledge of Rita Evans' mental disability. The State presented evidence of Furr's actual knowledge. John Furr testified that he informed James that Evans possessed the mentality of a twelve-year-old. The brother ordered James: "[d]on't mess with her." RP at 179. A reasonable jury could have found that James failed to prove his defense by a preponderance of the evidence.

## Legal Financial Obligations

By relying on the recent Supreme Court decision in *State v. Blazina*, 182 Wn.2d 827, 344 P.3d 680 (2015), James Furr requests discretionary review of the legal financial obligations imposed by the trial court. *Blazina* requires that a trial court enter an individualized finding, on the record, of a defendant's current or future ability to pay obligations before assessing discretionary costs.

In the event a defendant failed to object to the imposition of legal financial obligations before the trial court, *State v. Blazina* affords this court discretion in determining whether to review a challenge to the obligations on appeal. The author of the opinion wishes to review the imposition of discretionary financial obligations because of the high sum imposed. The author also notes that, although James Furr did not directly object to the obligations, he questioned his ability to pay. A majority has voted to decline review of the legal financial obligations.

## CONCLUSION

We affirm James Furr's conviction for second degree rape and his sentence.

No. 32543-1-III
*State v. Furr*

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Fearing, J.

WE CONCUR:

_____        _____
Siddoway, C.J.                          Korsmo, J.

14