# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  56049-6-II |
| Respondent, | |
| v. | |
| STANLEY HOWARD FRIEZE, | UNPUBLISHED OPINION |
| Appellant. | |

LEE, J. — Stanley H. Frieze appeals his five convictions for second degree rape.  Frieze argues that the evidence was insufficient to support his second degree rape convictions because the State failed to prove that the victim was incapable of consent due to mental incapacity.  We hold that the evidence was sufficient to support Frieze's second degree rape convictions and affirm the convictions.

## FACTS

The State charged Frieze by first amended information with eight counts of sexual offenses against his adopted daughter, L.F.,[1] which occurred when L.F. was between the ages of 12 and 23 years old.  The charges included five counts of second degree rape and one count each of second degree rape of a child, second degree child molestation, and third degree rape of a child.  The five

---

[1]  Initials instead of names are used for victims of sex crimes to protect their privacy.  Gen. Order 2011-1 of Division II, *In re Use of Initials or Pseudonyms for Child Witnesses in Sex Crime Cases* (Wash.          Ct.          App          Aug.          23,          2011), https://www.courts.wa.gov/appellate_trial_courts/?fa=atc.genorders_orddisp&ordnumber=2011-1&div=II.

counts of second degree rape were charged as being against a victim incapable of consent by reason of being physically helpless or mentally incapacitated in violation of RCW 9A.44.050(1)(b).[2] All eight charges included allegations that Frieze knew or should have known that L.F. was particularly vulnerable or incapable of resistance.

A.    TRIAL TESTIMONY

At trial, witnesses testified to the following facts.

1.    L.F.'s Background

Frieze and his wife Jeanette[3] adopted L.F. when L.F. was six years old. L.F. was diagnosed with a low IQ and needed near-constant supervision as the Friezes raised her. L.F.'s sister testified that she did not know the medical term but, from what she understood, L.F.'s mental capacity was capped out at as an eight-year-old. From the age of twelve onward, L.F. could take care of her own hygiene, but not always as well as she should. L.F. would need to be reminded about menstrual cycle hygiene.

Jeanette talked to L.F. about body parts, but she did not explain to L.F. how babies are made. At one point, L.F. heard Frieze and Jeanette having sex and brought it up at the dinner table.

---

[2] RCW 9A.44.050(1)(b) provides that a person is guilty of second degree rape when the person engages in sexual intercourse with a victim who is incapable of consent by reason of being physically helpless or mentally incapacitated.

RCW 9A.44.050 was amended in 2021, but no substantive changes were made affecting this appeal. Therefore, this opinion cites to the current statute.

[3] For clarity, this opinion uses Jeanette Frieze's first name because she shares the same last name as the appellant. We intend no disrespect.

Jeanette asked if L.F. knew what sex was, and L.F. said it was when Frieze "[was] on top of you and rubs on you." 7 Verbatim Report of Proceedings (VRP) (May 19, 2021) at 915.

L.F. masturbated regularly from the time she was adopted. Jeanette did not teach L.F. what masturbation was but did tell L.F. it was something she needed to do in her room in private.

Joanne Hardtke, an acquaintance of the Friezes from church, testified that L.F. would need reminders to put on deodorant or clean because L.F. would not notice the smell. Hardtke once noticed L.F. touching herself inappropriately over her clothing when she was driving L.F. home from a trip. Hardtke told L.F. to stop, and she did. Hardtke also testified that L.F. talked about marriage and dating in her own unique, childlike way. For example, L.F.'s favorite color is purple, and if she met a man whose favorite color was also purple, to L.F. that would mean they could get married.

Wilma Bower, another acquaintance from church, testified that she knew L.F. since L.F. was 12 or 13 years old. Bower noticed L.F.'s disability when she first met L.F. Bower babysat L.F. until L.F. was approximately 15 or 16 years old. L.F. moved in with Bower when L.F. was 23. L.F. was living with Bower at the time of trial.

Bower considers herself a kind of guardian to L.F. According to Bower, L.F. needs help with daily life and requires reminders to drink water, use deodorant, match her clothes, brush her teeth, wash her face, and do her hair. L.F. can use the bathroom by herself but "has a hard time" handling her menstrual cycles. L.F. struggles to take regular, thorough showers to clean herself completely. L.F. is afraid of the oven and cannot organize her own transportation. L.F. cannot grocery shop or manage money on her own. L.F. does not always feed herself, and Bower believes L.F. could be left alone for approximately two days.

For entertainment, L.F. reads children's books. L.F. can read and sound out big words like "'impossible'" but does not always understand them. 4 VRP (May 13, 2021) at 503. L.F.'s favorite book is a pre-K to first grade level book. L.F. also uses math workbooks, though she gets stuck with time tables and does not like division. Bower testified that these workbooks are "barely fourth grade" level. 4 VRP (May 13, 2021) at 508. L.F. also uses workbooks for reading comprehension but forgets what she reads and gets frustrated.

L.F.'s communication is "[c]hildlike," and L.F. often stares silently instead of answering simple yes or no questions. 4 VRP (May 13, 2021) at 506. L.F. can sometimes articulate what she wants. L.F. knows how to send text messages but texts very slowly.

Jennifer Nazarowski, a licensed clinical social worker and an acquaintance of the Friezes through church, testified about L.F. In her work, Nazarowski helps families with a variety of issues, including understanding individual cognitive abilities and any resulting limitations, putting assistance in place as needed, and providing the appropriate level of care. Nazarowski knew L.F. for over ten years through church activities and saw L.F. two or three times per week. Nazarowski believes L.F. functions mentally as a pre-adolescent in the 10- to 12-year-old range.

Paula Luedke, Ph.D., also testified. Dr. Luedke teaches in the Transitions Program, which is a program for students between the ages of 18 and 21 who have developmental disabilities. The mission of the Transitions Program is to give the students opportunities to learn and apply life skills and functional skills, and be able to work in society. Typically, students in the Transitions Program function academically somewhere between a preschool level and a sixth grade level, with a few students functioning "a little higher." 5 VRP (May 17, 2021) at 647.

Dr. Luedke taught L.F. as a student in the Transitions Program. Dr. Luedke testified that

4

> according to the psychologist's report, [L.F.] functioned pretty much at high third grade, in close approximately to a fourth grader in academic subjects. Adaptive-wise, [L.F.] was low end of the scores.

5 VRP (May 17, 2021) at 655. Dr. Luedke explained that "adaptive" means bathing, clothing, and toileting. 5 VRP (May 17, 2021) at 655. Dr. Luedke noted that, during tests, L.F.'s reading level was actually closer to a fifth grade level. Dr. Luedke did not think L.F. picked up on social skills or social cues. For example, L.F. smiled when another child tripped and fell. L.F. would need to be reminded not to talk to strangers. L.F. aged out of the Transitions Program around the age of 21, and Dr. Luedke did not believe L.F. could live independently without some sort of assistance.

2.        Allegations Against Frieze

In March 2019, when L.F. was 23 years old and living with Bower, Bower asked L.F. if anyone had ever touched her. L.F. said she had a secret and that it would split up the family if she told Bower. L.F. started crying. L.F. said she had been touched by the penis, which had rubbed in her front and back and inside.[4] Bower said L.F. uses the word "'in the front'" for her vagina, and uses the word "'butt'" for her butt or anus. 4 VRP (May 13, 2021) at 545. Before this conversation, Bower had not heard L.F. talk about sex or how babies are made.

Following this disclosure, Detective Sergeant Alexa Moss of the Pierce County Sheriff's Department spoke with L.F. Detective Sergeant Moss was tasked with evaluating if L.F. qualified for a forensic interview, which is for children between the ages of 3 and 15 and for individuals who present at that development level. In the interview, Detective Sergeant Moss paid attention to L.F.'s word choice, descriptions, and delay in answering questions. Detective Sergeant Moss

---

[4]  Bower did not testify about who L.F. said touched her because the State asked her not to name any names.

believed that L.F. had the conversational ability of someone who was at a young elementary school to mid-elementary school age level. Detective Sergeant Moss concluded that L.F. qualified for a forensic interview.

Keri Arnold, a child interviewer at the Pierce County Prosecuting Attorney's Office, performed the forensic interview. Arnold believed that L.F. understood the vast majority of Arnold's questions. However, L.F. took long pauses before answering questions, with the delay sometimes reaching up to a minute. Arnold was unable to place L.F.'s cognitive ability on a scale of chronological age because L.F.'s functioning varied greatly. Arnold stated that she "[didn't] know that [L.F.] was even functioning at a teenage level, but it just kind of depended." 8 VRP (May 20, 2021) at 1094. Arnold believed that L.F.'s ability to measure time and space was affected. However, L.F. corrected Arnold several times during the interview, which Arnold believed demonstrated clarity and understanding.

3. L.F.'s Testimony

L.F. testified at trial that Frieze "sticked his penis up into" her "virgina." 6 VRP (May 18, 2021) at 743. L.F. said Frieze humped her, which L.F. said meant he went back and forth. The State asked if anything came out of Frieze's penis when he was humping L.F., and L.F. said, "White goo." 6 VRP (May 18, 2021) at 746. The State asked what happened with the white goo, and L.F. paused then said, "It makes babies." 6 VRP (May 18, 2021) at 746. The State asked L.F. how she knew that, and L.F. said, "I'm not sure on that one." 6 VRP (May 18, 2021) at 746.

L.F. also testified to other acts of sexual intercourse and molestation committed by Frieze against L.F.'s bottom, which she call "[m]y bacoosh," and her "virgina." 6 VRP (May 18, 2021) at 747, 752-54, 756. L.F. told Frieze to stop three times because she did not like it.

L.F. further testified that she has a disability and thinks like a child. L.F. tries "to get [her] brain to think like an adult," but it is hard for her. 6 VRP (May 18, 2021) at 741. L.F. has never had a boyfriend, though she has wanted a boyfriend. L.F. does not know if she wants to get married and does not know what it means to be married. L.F. testified that dating means going out with someone, chitchatting, and eating. L.F. also testified that married means "when you're together." 6 VRP (May 18, 2021) at 789.

L.F. testified that her "virgina" is used to go to the bathroom, and penises are also used to go to the bathroom. 6 VRP (May 18, 2021) at 747. The State asked if L.F. knew how babies are made, and L.F. said no. The State then asked what L.F. thought the white goo stuff does, and L.F. said, "It probably forms a baby." 6 VRP (May 18, 2021) at 759. L.F. went on to testify that she did not remember how she knew that and did not learn it in school. L.F. also testified that her private area is involved in making babies and that babies get made by a man. L.F. said she did not know how a man makes a baby. L.F. testified that babies grow in the mother's stomach. L.F. knew that, for a baby to grow, the man has to do something to the woman, but L.F. did not know what that was. The State asked L.F. if she knew what "'oral sex,'" "'anal sex,'" or "'vaginal sex'" meant, and L.F. said no to all three questions. 6 VRP (May 18, 2021) at 813.

4.    Frieze's Testimony

Frieze testified at trial. Frieze testified that he had never had sexual contact or intercourse with L.F., had erectile dysfunction following a stroke, and could no longer ejaculate due to medication.

B.    JURY INSTRUCTIONS

On each of the second degree rape charges, the trial court instructed the jury that the State must prove beyond a reasonable doubt that Frieze engaged in sexual intercourse with L.F. when L.F. was incapable of consent by reason of being physically helpless or mentally incapacitated. The trial court also instructed the jury that mental incapacity is a "condition existing at the time of the offense that prevents a person from understanding the nature or consequences of the act of sexual intercourse whether that condition is produced by illness, defect, the influence of a substance or by some other cause." Clerk's Papers at 277.

C.    VERDICT AND SENTENCING

The jury found Frieze guilty of five counts of second degree rape, one count of second degree rape of a child, and one count of second degree child molestation. For each of the findings of guilt, the jury returned a special verdict that Frieze knew or should have known that L.F. was particularly vulnerable or incapable of resistance. The jury found Frieze not guilty of third degree rape of a child.

The trial court vacated the second degree rape of a child conviction because it was not clear if the jury based its guilty finding for that crime on the same act as that for its guilty finding on one of the second degree rape charges. The trial court imposed a standard range sentence on all counts, bringing the sentence of total confinement to 280 months to life.

Frieze appeals.

ANALYSIS

Frieze argues that the evidence is insufficient to support his five convictions for second degree rape of a person who was incapable of consent by reason of being mentally incapacitated.

Specifically, Frieze argues that the evidence was insufficient to show that L.F. was incapable of consent by reason of being mentally incapacitated. We disagree.

We review challenges to the sufficiency of the evidence by considering whether any rational trier of fact, in viewing the evidence in the light most favorable to the State, could find the essential elements of the crime beyond a reasonable doubt. *State v. Rich*, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). An insufficiency of the evidence claim admits the truth of the State's evidence and all reasonable inferences that can be drawn from that evidence. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). All such inferences "must be drawn in favor of the State and interpreted most strongly against the defendant." *Id.* Direct and circumstantial evidence are equally reliable. *State v. Miller*, 179 Wn. App. 91, 105, 316 P.3d 1143 (2014). We defer to the trier of fact on issues of conflicting testimony, witness credibility, and the persuasiveness of evidence. *State v. Ague-Masters*, 138 Wn. App. 86, 102, 156 P.3d 265 (2007).

The State charged Frieze with second degree rape under RCW 9A.44.050(1)(b), which required the State to prove beyond a reasonable doubt that Frieze engaged in sexual intercourse with L.F. when she was incapable of consent by reason of being physically helpless or mentally incapacitated. Frieze challenges the sufficiency of the evidence for L.F. being incapable of consent by reason of being mentally incapacitated and does not provide argument on the other elements. Br. of Appellant 13-14, 22.

"Mental incapacity" is a condition existing at the time of the offense that prevents the victim from understanding the nature or consequences of the act of sexual intercourse. RCW

9A.44.010(7).[5] A finding of mental incapacity is appropriate if the "jury finds the victim had a condition which prevented him or her from *meaningfully* understanding the nature or consequences of sexual intercourse." *State v. Ortega-Martinez*, 124 Wn.2d 702, 711, 881 P.2d 231 (1994) (emphasis in original). "A meaningful understanding of the nature and consequences of sexual intercourse necessarily includes an understanding of the physical mechanics of sexual intercourse." *Id.* at 711-12. But a meaningful understanding also includes "a wide range of other particulars." *Id.* at 712. For example, the nature and consequences of sexual intercourse can include the development of emotional intimacy between sexual partners, disruption in established relationships, pregnancy and its accompanying decisions and consequences, and "the specter of disease and even death." *Id.* A victim is not required to understand any or all of these particulars before they meaningfully understand the nature or consequences of sexual intercourse, but a factfinder should keep these particulars in mind when determining whether or not the victim was capable of having that meaningful understanding. *Id.* These particulars

> are especially important to acknowledge in prosecutions involving the mentally disabled because such individuals may have a condition which permits them to have a knowledge of the basic mechanics of sexual intercourse, but no real understanding of either the encompassing nature of sexual intercourse or the consequences which may follow.

*Id.*

In assessing whether a victim had a condition that prevented them from understanding the nature or consequences of sexual intercourse at the time of the incident, the jury can consider the victim's testimony about their own understanding; the victim's demeanor, behavior, and clarity on

---

[5] RCW 9A.44.010(7) was renumbered from RCW 9A.44.010(4) in 2007 and 2020 to RCW 9A.44.010(7) in 2022.

the stand; the victim's IQ, mental age, and ability to understand fundamental nonsexual concepts; the victim's general mental faculties; and the victim's ability to translate information acquired in one situation to a new situation. *Id.* at 714.

Here, the State produced evidence that L.F. was disabled and mentally functioned as a child. Several witnesses testified about L.F.'s mental disability, and Jeanette testified that L.F. was diagnosed with a low IQ. Witnesses described L.F.'s mental age and abilities as everything from young elementary school to 8 years old to pre-adolescent in the 10- to 12-year-old range. Bower and Dr. Leudke both testified about L.F.'s academic functioning and placed L.F. somewhere between a third grade and fifth grade level. The State also presented evidence that L.F. struggled with understanding and performing fundamental nonsexual concepts like hygiene, eating, drinking water, going places, shopping, managing money, and measuring time and space.

Several other statements indicated that L.F. struggles with personal relationships and social skills. Dr. Luedke testified that L.F. did not pick up on social cues, responded inappropriately by smiling when someone tripped and fell, and needed to be reminded not to talk to strangers. One church acquaintance testified about L.F.'s "unique" and "childlike" conception of marriage and stated that L.F. might think marriage is proper if she meets someone with the same favorite color as her. 6 VRP (May 18, 2021) at 713. L.F. testified that she did not know what marriage meant and at another point stated that marriage was "when you're together." 6 VRP (May 18, 2021) at 789. Similarly, L.F. testified that dating means going out with someone, chitchatting, and eating. From this testimony, a rational factfinder could conclude that L.F. was incapable of connecting the idea of romantic or emotional intimacy to sexual situations or understanding how sex might disrupt existing relationships.

Importantly, L.F.'s testimony showed a poor understanding of the physical mechanics of sexual intercourse and how it can result in pregnancy. While L.F. could name some body parts and describe what happened to her, the ability to name body parts and say what physically happened to them does not constitute a *meaningful* understanding of the nature and consequences of sexual intercourse. *See Ortega-Martinez*, 124 Wn.2d at 711-12. Similarly, L.F.'s acts of masturbation and knowledge that masturbation is private do not show any understanding of sexual intercourse. While L.F. could identify a penis, she referred to her vagina as her "virgina," referred to her bottom or anus as her "bacoosh," and called semen "[w]hite goo." 6 VRP (May 18, 2021) at 743, 747, 746. L.F. believed that her "virgina" is used to go to the bathroom and that babies grow in the mother's stomach. 6 VRP (May 18, 2021) at 747. L.F. testified that she did not know how babies are made, then said white goo "probably forms a baby," though she did not know what a man needed to do to a woman to make a baby. 6 VRP (May 18, 2021) at 759. L.F. also testified that she did not know what "'oral sex,'" "'anal sex,'" or "'vaginal sex'" meant. 6 VRP (May 18, 2021) at 813. There is little evidence that L.F. understood any part of pregnancy and no evidence that L.F. understood pregnancy's resulting consequences or decisions.

Beyond all this testimony, the jurors had the opportunity to observe and draw conclusions from L.F.'s demeanor, behavior, and clarity while on the stand. *See Ortega-Martinez*, 124 Wn.2d at 714. Throughout L.F.'s testimony, she misused basic language and mispronounced words. Multiple witnesses described or alluded to L.F. as having a unique conversational style that includes long delays in responding to questions. While not dispositive, the jury's observations of L.F.'s behavior and responses on the witness stand likely assisted the jury in evaluating her general mental faculties.

No. 56049-6-II

Viewing all the evidence above in the light most favorable to the State, a rational factfinder could conclude that L.F.'s mental disability prevented her from meaningfully understanding the nature and consequences of sexual intercourse at the time of the offenses.[6] *See id.* at 711-12. Therefore, a rational factfinder could conclude that L.F. was incapable of consent by reason of being mentally incapacitated at the time of Frieze's offenses. *See* RCW 9A.44.010(7); *Ortega-Martinez*, 124 Wn.2d at 711. Accordingly, we hold that the evidence is sufficient to support Frieze's five convictions for second degree rape.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Worswick, P.J.

Price, J.

---

[6] Frieze appears to argue that L.F. was not incapacitated because L.F. had a greater mental capacity than the victim in *Ortega-Martinez*. We reject this interpretation of *Ortega-Martinez*. *Ortega-Martinez* set forth the legal standard on which courts determine incapacity—whether the victim has a condition that prevented them from meaningfully understanding the nature or consequences of sexual intercourse. 124 Wn.2d at 711. *Ortega-Martinez* did not set forth a standard that all victims with more capacity than the victim in *Ortega-Martinez* are not incapacitated.

13